OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1912.

---

### *(Continued from Volume 242)*

---

## JOHN H. LIPSCOMB, Appellant, v. LEANDER J. TALBOTT and NATIONAL BANK OF COMMERCE.

**Division One, May 31, 1912.**

1. **RATIFICATION: Authority.** He who can authorize may ratify. Ratification is tantamount to a prior authority and relates back to it.

2. **————: ————: Pleading.** In this jurisdiction the rule seems to be that if a party relies on ratification he should tender such issue in his pleadings; but the soundness of that rule is doubted, but not decided, because its decision is not necessary to a proper disposition of the case.

3. **LIMITATIONS: Adverse Possession.** The Statute of Limitations does not apply unless there has been adverse possession.

4. **————: ————: Deed as Mortgage.** For the purposes of a mortgage the Statute of Limitations does not run while the mortgagee is in possession under the mortgage. So that if the conveyance to the bank, absolute in form, was in substance and in equity a mortgage to secure a debt to the bank, and if the bank took possession under that conveyance, then it held possession presumably as mortgagee, and not adversely to the grantor and the maker of the note secured thereby.

5. ———: ———: ———: **Change to Hostile Possession.** A mortgagee in possession, while the relation exists, does not hold adversely to the mortgagor; and a possession, begun under the reciprocal right to foreclose or to redeem, is presumed to so continue, until by acts hostile and unequivocal in character, an adverse possession is openly and manifestly set up as a bar. The mere fact that more than ten years have elapsed since the mortgagor, by a deed absolute in form, conveyed the land to the payee of the note, under an agreement that the land should be sold and the proceeds applied as credits on the note, does not bar the legal holder of the note of the right to subject the land to that use.

6. **MORTGAGE: In Form an Absolute Conveyance: To Secure a Debt: Necessary Elements.** Where there was a subsisting debt, a request for security, a compliance with that request by a conveyance absolute in form but made to secure that debt and made under an understanding and agreement that when the land was sold the proceeds should be credited on the debt, the conveyance was a mortgage; and once a mortgage it continued to be a mortgage, whether or not the land was sold, or whether or not more than ten years have expired since it was made and the mortgagee put in possession.

7. ———: ———: **Redemption and Foreclosure.** The right of redemption and the right of foreclosure are inseparable and inherent in a mortgage, in spite of the intent of the parties. As between the mortgagor and mortgagee, the power of the mortgagee in possession to sell and apply the proceeds to the debt does not affect the character of the instrument.

8. ———: ———: **Value of Security.** The fact that the value of the security was less than the debt does not affect the character of the conveyance. It does not show that the mortgagee took the property, conveyed by a deed absolute in form, in payment of the debt.

9. ———: **Follows Debt: Assignment of Note: Delivery Alone.** The mortgage and debt are inseparable. There being a mortgage it becomes an incident of the debt, and follows it like a shadow. An assignment of the note secured by a mortgage carries the mortgage as an incident; and title to the note may pass with delivery without a formal indorsement.

10. ———: **Right of Redemption Canceled.** Where whatever was done in the way of an agreement was done at the time the conveyance was made, and the mortgagor made no subsequent agreement for an adequate consideration whereby the equity of redemption was released to or purchased by the mortgagee, the right to redemption, under a deed absolute in form, was not canceled or abrogated.

11. **NOTE: Sale: Presumption.** When a stranger to a note negotiated for it, the presumption is that he intended to buy it; and where the evidence establishes that he intended to buy, the strong presumption is that the thing done was in fact a purchase and not a payment. In addition, the possession of the note by him is sufficient to raise a presumption of a proper transfer by some one possessed of title to the note.

12. ———: ———: **Authority to Sell.** The facts of this case show that the bank, which was the payee of the note and had placed it in the hands of an agent for collection, subsequently authorized that agent to sell the note.

13. ———: ———: **Offer to Buy: Information from Agent to Principal.** The usual course of business is for the agent, in whose hand the payee has placed a note for collection, when he has received an offer from a stranger to buy the note, to either refuse the offer or to submit it to his principal for decision.

14. ———: ———: **Forgetfulness of Security: Lack of Knowledge by Agent.** Neither the fact that the payee, at the time he authorized his agent to accept the offer of a stranger to buy the insolvent maker's note, had forgotten that it was secured by a mortgage on land by a deed absolute in form, nor the fact that the payee labored under the impression that the land had been sold and the security exhausted, affected the fact or validity of the sale. Neither forgetfulness or inadvertence of the payee, nor lack of knowledge of his agent that the note was secured by a mortgage, kept the mortgage as an incident of the note from passing to the purchaser.

15. ———: ———: ———: ———: **Unexpected Results: Hard Case: Carelessness.** The fact that the result of the sale may be unexpected or harsh, and that the case, on the right of the purchaser of the note to have his legal right to the benefit of the mortgage given to secure the note may be hard, does not affect the fact that the note was sold, or the right of the purchaser to the property mortgaged to secure its payment. Neither equity nor the law relieves those who seek aid in court merely to avoid the effects of their own negligence.

16. ———: ———: **Bought on Joint Account With Maker: Evidence.** Testimony by the maker of the note that he thought or hoped or expected the purchaser of the note (a stranger) would give him something if he bought the note and got anything out of the property mortgaged to secure its payment, is without any efficacy to show that the purchaser bought the note in joint account with the maker.

17. ———: ———: **Fraud: Each Case Dependent on Own Facts.** Fraud in sales arises in so many ways that the law applicable

to one case cannot be mechanically applied to another unless the facts are similar.

18. ————: ————: ————: **Of Vendee: Rescission of Sale: Failure to Reveal Knowledge of Mortgage.** The owner of a note, a great bank, put it on the market, and as vendor now sues the vendee (a third party), who bought the note for a nominal sum (less than one-half of one per cent of its face) to rescind the sale on account of fraud. There was no fiduciary relation between them; the vendor reposed no trust or confidence in the vendee; neither asked of the other any information or facts operating as a moving cause in the transaction; and neither belonged to the class looked upon as wards in chancery. The maker of the note was insolvent, but it was secured by a mortgage in the form of an absolute deed by which valuable land had sixteen years previously been conveyed to the vendor (the bank) upon condition that the land should be sold and the proceeds credited on the note; and the contest is really over the land, which has not been sold. *Held*, that the sale cannot be rescinded because the vendee did not disclose to the vendor that he suspected or knew the note was secured by a mortgage that would greatly enhance its value. If the bank forgot the existence of the mortgage, its vendee was under no legal obligation to remember for it and warn it.

19. ————: ————: **Rescission: Mistake.** To rescind a contract on the ground of mistake, the mistake must be a mutual one of fact. If the vendor of a note makes a mistake in supposing that the mortgage does not follow the ownership of the note as an incident, that is a mistake of law. If it made a mistake in supposing the mortgaged property had been exhausted by sales, that was its own mistake, arising from its own negligence, with which the vendee of the note had no part. If it made a mistake in supposing the right of redemption (the equity of redemption) had been cancelled, that was also its own mistake. In neither case, was there such a mistake as authorizes a rescission of the contract of sale.

Appeal from Jackson Circuit Court.—*Hon. W. A. Powell*, Judge.

REVERSED AND REMANDED (*with directions*).

*Gage, Ladd & Small* and *Joseph S. Rust* for appellant.

(1) The deed of Talbott to White was absolute in form, but, as alleged by the bank in its answer and

shown by unmistakable and uncontroverted evidence, made to secure the note sued on, without any claim or pretense of any extrinsic condition and is in law a mortgage. Wilson v. Drumorte, 21 Mo. 325; Langdon v. Buel, 9 Wend. 80; Swift v. Bank, 114 Fed. 644; Bank v. Bank, 203 U. S. 306; Carpenter v. Longan, 16 Wall. 271; 27 Cyc. 1287; Sheppard v. Wagner, 240 Mo. 439. (2) The sale of the Talbott note to plaintiff constituted an assignment of the mortgage as a necessary and inseparable incident to the note secured. This is true, although the note was not indorsed and was transferred by delivery. Boeka v. Nuella, 28 Mo. 180; Bennett v. Pound, 28 Mo. 598; Davis v. Carson, 69 Mo. 609; 27 Cyc. 1287, 1288, 1290, 1293 and 1307, and note 67; Hagerman v. Sutton, 91 Mo. 531; Inv. Co. v. Vette, 142 Mo. 573; Martin v. Nowlin, 2 Burr, 969; Jones on Mortgages, 1377; Pickett v. Jones, 63 Mo. 195; Johnson v. Johnson, 81 Mo. 331. (3) The authority of the agent, the Barr-Widen Mercantile Agency, to sell the note to the plaintiff was complete and perfect: (a) Because such is the legal construction of the offer of Lipscomb transmitted to the bank by the agent in its letter of January 5, 1907 (the lost letter), and the acceptance of that offer by this bank contained in the letter of W. S. Woods, president, of January 12, 1907. (b) Because the bank in the interview between W. S. Woods, president, and Joseph S. Rust, attorney for plaintiff, ratified the action of its agent in making the sale. (c) Because the bank still further ratified the sale by its agent by retaining the proceeds of the sale after being specially notified that the transaction was a sale in the interview between W. S. Woods, president, and Talbott and Bruun. (d) Because the bank ratified the action of its agent in selling the notes by retaining the proceeds of the sale after receiving information of the fact of the sale by the petition in this case until October 18, 1908, when it filed its amended answer herein and for the first time offered to return the proceeds. Mechem

on Agency, secs. 149, 169 and 181; Kirkpatrick v. Pease, 202 Mo. 490; Beagles v. Robertson, 135 Mo. App. 327; Clarke & Sykes, Agency, 149a. (4) The statements of plaintiff regarding Talbott's insolvency were untrue and the fact was as well known to the bank as to Lipscomb, and these statements were never communicated to the bank; and the bank determined for itself by its letter of January 12, 1907, to its agent, to close the deal and in so doing was entirely uninfluenced by any representations of plaintiff. (5) The bank and plaintiff in the sale and purchase of the note were dealing at arm's end and Lipscomb was under no obligation to disclose to the bank any material information he might have as to the value of the note or any matter affecting its value; much less was he under obligation to disclose to the bank any surmises or suspicions he might have or entertain as to the reasons the bank might have for intrusting the note to such a concern as the Barr-Widen Agency. (6) The bank is itself responsible for the disposition of the note for a trifling consideration; it placed the note in the hands of the Barr-Widen Agency knowing its character as a wrecking concern, a junk shop of worthless paper, its methods well known, widely advertised in every way, on all its letter-heads, as "Publishers of delinquent debtors who can but do not pay their just debts and who are consequently unworthy of trust or confidence. Reporters of how people pay their bills—expert adjusters of debts throughout the United States, Canada and Europe. Correspondents everywhere; the world our territory." The bank by taking these notes from its own collecting department here where Talbott resided and placing it in the hands of the Barr-Widen concern effectually condemned it as the toughest of tough debts and practically made it of no value whatever. If it is material to the case to know why the bank did this, the bank, not Lipscomb, must be asked. When Lipscomb's attention was drawn to the matter and he

found the notes in these agents' hands thus depreciated, he was not bound to inquire why the bank had done this or speculate upon its motives. (7) The plan of disposing of this Talbott note for the poor pittance that could be obtained for it through the Barr-Widen Agency was devised by the bank and not suggested by Lipscomb. The note called for (face and interest) nearly $160,000, and the notes along with it made the amount disposed of nearly, if not quite, $200,000. The amount to be expected from this source was not sufficient to have led the "biggest bank in the west" to take such a course. The evident purpose was to put this note out of sight and reach, where it never would be seen or heard from again. The bank officers cannot say that they did not know that the White deed was a mortgage. They were not inexperienced or imbeciles; if this deed should be forever lost and its loss could be accounted for the White deed would be in fact absolute and any arrangements built upon it would stand. This is a fairer suspicion than any that attaches to Lipscomb for having obtained the note for an inconsiderable consideration or his failure to question the bank as to what it meant by sending its notes to the junk shop. (8) The plaintiff in purchasing the note was in no confidential relation to defendant, and was under no obligation to disclose to defendant his suspicion, if he had any, that defendant was disposing of the note without any reference to the security, and without any intention, by reason of forgetfulness or mistake of law, that the security should pass to plaintiff along with the note as incident thereto. The parties were dealing "at arm's end." Nor was Lipscomb bound to remind the bank as to the existence of the security. Fox v. Mackreth, 2 Bro. C. H. 420; Wood v. Boynton, 64 Wis. 265; Dambmann v. Schulting, 75 N. Y. 55; 1 Story's Eq. Juris. (12 Ed.), 205 and 244; Kerr on Fraud, 73, 75, 90, 100, 103, 404, 432; Benj. on Sales, 355; Birch v. Shelton, 14 Barb. 73; Paul v. Had-

ley, 23 Barb. 521; Paul v. Keys, 12 East. 637; 9 Cyc. 397. (9) The bank is not entitled to relief from a mere oversight or ignoring on its part of what it knew. That did not rise even to the dignity of a mistake, and the only mistake it made, if any, and the only mistake anyone made, if any, was that the bank made a mistake of law, and a mistake of law such as this would have been affords no relief in equity. Clark v. Carter, 234 Mo. l. c. 100; Kennedy v. Mill Co., L. R., 2 Q. B. 580; 9 Cyc. 395. (10) A party will not be given relief against a mistake induced by his own negligence, and he must show due diligence to investigate alleged false statements. Jones v. Foster, 175 Ill. 459. (11) In cases where third parties have advanced money and taken up notes or judgments and it is contended on one hand that the transaction is a payment and on the other hand a purchase, the party taking the security being under no obligation to pay the debt, the construction to be put on the transaction depends largely on the intention of the party taking up the security. If the instrument taken up be a note, it does not matter that the transfer is by delivery without indorsement of the paper. Prather v. Hairgrove, 214 Mo. 142; Campbell v. Allen, 38 Mo. App. 28; Harbeck v. Vanderbilt, 20 N. Y. 398.

*Elijah Robinson* and *Harris Robinson* for respondents.

(1) Plaintiff acquired no title to the Talbott notes. Authority to collect was not authority to sell, and there is no pretense that Barr & Widen had any authority other than that of an agent to collect. Mechem on Agency, sec. 383. (2) Even if Barr & Widen had had authority to sell, the transaction was invalid and not binding on the bank, because plaintiff procured the notes by fraud and false representations. Dambman v. Schulling, 75 N. Y. 55; Laidlaw v. Organ,

2 Wheat. 178. (3) Even if Barr & Widen had had authority to sell, the transaction was not binding on the bank for the further reason that the minds of the parties did not meet, and there was, therefore, no contract. Talbott thought the notes carried with them a lien on the real estate, when he knew that Barr & Widen had no information as to any such lien. Green v. Cole, 103 Mo. 70; Cockrell v. McIntyre, 161 Mo. 69; Scott v. Davis, 141 Mo. 225; Egger v. Nesbitt, 122 Mo. 675; Taylor v. Van Shraeder, 107 Mo. 206; Perkins v. School Dist., 99 Mo. App. 483; Lowery v. Danforth, 95 Mo. App. 450; Chapline v. Stone, 77 Mo. App. 529; Barton v. Hunter, 59 Mo. App. 610; Robison v. Estes, 53 Mo. App. 582; 9 Cyc. 396, note 97. (4) By agreement of the parties, as shown by their conduct, the defeasance had been canceled and the title became absolute in the bank. Shubert v. Stanley, 52 Ind. 46; Vennum v. Babcock, 13 Iowa, 194; Harrison v. Academy, 12 Mass. 456; Trull v. Skinner, 17 Pick. (Mass.) 213; Stall v. Jones, 47 Neb. 706; Haggerty v. Brown, 105 Iowa, 395; Carpenter v. Carpenter, 70 Ill. 457. (5) There was no ratification by the defendant bank of the transaction between Barr and Widen, if that transaction is to be considered as a sale of the notes in question to plaintiff Lipscomb. Ratification consists of the acceptance of the results of an act with intent to ratify, and with full knowledge of all the material circumstances. Ansonia v. Cooper, 64 Conn. 544; Curnane v. Scheidel, 70 Conn. 13; Blen v. Mining Co., 20 Cal. 613; Railroad v. Pac. Beach Co., 112 Cal. 53; Scott v. Buchanan, 11 Humph. (Tenn.) 470. The acts claimed to effect a ratification must be of such a nature that the rights of the other party who has a right upon them, will be prejudiced if a ratification has taken place. Doughaday v. Crowell, 11 N. J. Eq. 201. (6) It is apparent from the evidence in the case, that there was an understanding between Lipscomb and Talbott, that Lipscomb should procure the notes and subject the real

estate to sale for their joint benefit; and this being true, Lipscomb stands in no better position than Talbott would, if he had bought the notes himself, or procured possession of them in the same way Lipscomb did. (7) The bank, for some fifteen years, had possession of this property, claiming to be the absolute owner thereof, listing it with the assessor and paying taxes on it, etc., and during all that time Talbott had regarded it and treated it as the absolute property of the bank. It, therefore, follows that any action on the part of either party, seeking to treat the conveyance as a mortgage, would be barred by limitation.

LAMM, J.—This is a strange case. It no little illustrates the French saw: The unexpected always happens.

The suit is in equity to have a deed (absolute on its face) declared a mortgage, to foreclose the mortgage and for judgment on a note alleged to be secured by the mortgage.

Cast below on the merits by a decree granting affirmative relief to defendant bank, plaintiff appeals.

A summary of the pleadings will not be amiss, thus:

The bill alleges that defendant Talbott, being indebted to defendant bank, on September 3, 1890, executed to it his promissory note in a certain sum, which note (after certain renewals) was finally renewed on August 25, 1892, for $45,690, due in sixty days, with interest from due at 8 per cent per annum, to be compounded if not so paid; that on January 31, 1907, defendant bank sold and delivered said note to plaintiff for a valuable consideration and plaintiff thereby became and is now its owner; that said note is due and wholly unpaid; that on the said September 3, 1890, Talbott, at the request and instance of the bank and for the purpose (and only purpose) of securing payment of said note, conveyed to one White two tracts of

land situate in Jackson county—one of 43.97 acres and the other of 30.38 acres (saving therefrom certain parcels Talbott had already sold); that said two tracts are described by metes and bounds in the bill, and a portion thereof at the time of the conveyance had been platted and was a part of the town of Leeds; that afterwards White, at the instance of the bank and for its uses and benefit, conveyed away parcels of the land to purchasers, and subsequently on August 29, 1892, conveyed what was left of it to defendant bank at its instance and without consideration; that the conveyance from Talbott to White was as security for the named indebtedness and vested title in him in trust for such purpose and authorized him on the maturity of the debt, in default of payment, to sell so much of the land as might be necessary to pay the debt and reconvey the remainder to Talbott; that the bank by its deed from White took title subject to the same trust, and thereafter held title as trustee or mortgagee with power of sale to secure Talbott's said note; and that thereafter the bank sold certain parcels of the land, but it now holds certain other portions thereof in trust and as mortgagee as aforesaid (which part unsold is described in the bill).

Wherefore, plaintiff prayed judgment that the title to the remaining lands held by the bank be declared and adjudged to be held by it as trustee and mortgagee to secure the payment of said note now owned by plaintiff, that plaintiff have judgment against Talbott for the note, and that the equity of redemption in the described land and lots be foreclosed and that part of the mortgaged property be sold to satisfy the amount found due on the note.

Defendant Talbott filed no answer.

That of defendant bank denies all allegations not "expressly admitted." It then alleges that "some eighteen or twenty years ago" Talbott borrowed a sum in excess of $45,000 from defendant bank and ex-

ecuted his note; that he was then solvent, but subsequently became insolvent and unable to meet his obligations, including said note; that, desiring to avoid suit, he conveyed to White (cashier of defendent bank) the real estate mentioned in the petition, on the agreement that White should hold the same for the benefit of the bank and that the bank might sell the same at such times and prices as it saw fit, giving Talbott credit for sums so realized; that ever thereafter Talbott, plaintiff and defendant bank knew that the real estate was of less value than the amount owing the bank; that at the time of his deed to White it was understood and agreed between Talbott and the bank that by such conveyance Talbott was to and did divest himself of all interest in the land, and that defendant bank was to and did assume "absolute control" thereof and was to pay all taxes and other charges; that pursuant to said agreement Talbott had ever since said conveyance "recognized" defendant bank as "absolute owner of said real estate" and it had exercised absolute control over the same, etc. That never since that time has the real estate equaled 50 per cent of the amount of Talbott's indebtedness to the bank, which fact Talbott and plaintiff knew at the time the latter alleges in his petition he purchased the note. The answer then goes on to charge that plaintiff got possession of the note (if he has such possession) "by fraud and false representations on his part and by mistake on the part of" the Barr and Widen Mercantile Agency; that said agency was in the business of collecting "bad and doubtful claims" and on a certain unnamed day defendant bank delivered the note in question with others to said agency for the purposes of collecting what it could from the makers; that thereupon the agency notified Talbott it held his note for collection and asked a proposition from him "looking to a release of any further liability on his part for the payment of said note;" that Talbott and plaintiff were intimate

friends, occupying the same office, and Talbott advised plaintiff of the proposition made by the agency; that thereupon plaintiff and Talbott, laying their heads together, conceived a plan whereby, for a nominal consideration, they might get possession of the note, thereafter claim plaintiff owned it and subject said real estate to its payment; that they entered in a "conspiracy and combination" to that end and in pursuance thereof plaintiff represented to the agency that Talbott owed four or five hundred thousand dollars, had no assets and that plaintiff would pay $200 "for the surrender of said note to him, purposely leading said agency to believe that in that respect he was acting for said Talbott;" that relying on such representations the agency accepted said sum of $200 and delivered the note to plaintiff; that the agency had no authority "to sell the note," and plaintiff and Talbott well knew that fact; that by the acceptance of said $200 the agency did not intend to invest plaintiff with any legal or equitable title to said real estate, and it would not have delivered said note to plaintiff "if it had had any idea whatever" that by such delivery he would undertake to assert a claim against said real estate—all of which Talbott and plaintiff well knew at the time plaintiff got the note; that they purposely concealed from the agency "and from this defendant" their purpose to have plaintiff claim ownership and endeavor to subject the real estate to the payment of the note; that in none of the communications between the agency and the plaintiff was anything said about the real estate; that the agency knew nothing about defendant's holding any real estate and, as said, did not intend to transfer to plaintiff any interest therein, all of which Talbott and plaintiff well knew; that if, in fact, plaintiff and Talbott supposed that plaintiff would acquire an interest in the real estate by acquiring possession of the note, then the minds of the parties to said transaction never met and the acceptance of

said $200 by said agency and the surrender of the note resulted from "a mistake;" that, disposed to act fairly in the premises, defendant bank brings into court $200 with interest from the date of the alleged purchase of the note and tenders the same to plaintiff, praying the court to decree that he has no claim upon said note and that the same be returned to defendant bank.

Finally the answer sets up a defense of the ten-year Statute of Limitations against the cause of action and further pleads that for more than ten years next before suit defendant bank has been in open, notorious, continuous and adverse possession of the real estate described in the petition.

The reply was a general denial.

The chancellor found "the issues" against plaintiff and for the bank, dismissed the bill, decreed that plaintiff turn over the note mentioned in the petition to the bank and that the sum deposited by the bank in court, $221.20, be held by the clerk payable to plaintiff upon his request.

From that decree, as said, in apt time and on due steps, plaintiff comes up.

It will be observed that defendant's answer, guardedly drawn, amounts to a plea of confession and avoidance of the allegation in the bill that the conveyance from Talbott to White was a mortgage, and that the bank holds title from White in the same way. So, while the brief of defendant's counsel does not directly admit that such conveyance was a mortgage, yet it makes no point that the conveyance was not a mortgage and takes no position contrary to that view of it. Be that as it may, the evidence abundantly shows that Talbott made the deed to White, cashier of the bank, as a security for a subsisting debt due the bank in 1890, and evidenced by a live note as alleged in the petition. The last renewal of that note came into the possession of plaintiff, in a way presently stated, without any credits, without the indorsement of the bank and is the note

in suit. The case may proceed upon that theory. It may proceed upon the further theory that when White made his deed to the bank the bank paid nothing, took with notice of the title White held and impressed with the same trust. It got what White had and thenceforward stood in his shoes. It was admitted, for what it is worth at the trial, that the land undisposed of was worth between twenty-five and thirty thousand dollars. The note with its accumulated interest, as calculated by counsel, amounts to the rise of a hundred thousand dollars.

Defendant Talbott in his business prime had been a man of affairs, had been mayor and auditor of Kansas City and for ten or fifteen years a director in defendant bank, a manufacturer, and a real estate dealer, a long-time personal friend of Doctor Woods, president of defendant bank, and apparently had such marked financial standing, credit and personal worth that the bank loaned him on his own name $45,000. But riches take wings, and there came a time when the depression following the breaking of the real estate bubble, known as "the boom" in Kansas City, left him broken in fortune and owing several hundred thousand dollars—mostly assumptions of mortgage debts on property in which he once owned an equity. At that time, at the solicitation of the bank, and unable to do more, he made a deed to its cashier conveying the land in question as security for the indebtedness evidenced by the note in hand. There was no evidence sustaining the allegation of the answer that the conveyance was made to avoid suit. It was asked as "security" and given as such. The deed conveyed Talbott's home of ten acres, an interest in another tract, and the two tracts in question. The title to the first two tracts passed off by foreclosure sales under subsisting deeds of trust and they do not concern us.

At the time of that conveyance the land could not have been sold for the amount of the note. The plan

was for Talbott to go on and make sales and for the bank to make sales when real estate looked up, or sales could be made, and the proceeds of those sales were to be credited on Talbott's said note. Talbott was not able to make any sales and in 1893 went to Colorado to live. There are indications in the record that the bank made some sales, but when made and the amount realized therefrom is dark, and for some unaccountable reason (either design or carelessness) no credits at any time were put upon the note. At some uncertain time the bank transferred the land to the "real estate account" on its books and "charged off" the note as worthless paper. Thenceforward the data relating to the debt and transaction were kept in a place in the bank called the "morgue."

In 1903 Talbott returned to Kansas City, opened a real estate office in 1904 and plaintiff officed with him. He had been unable to retrieve his fortune and was still a hopeless insolvent, owing with accumulations of interest four or five hundred thousand dollars, with no means to pay. He had been advised to return to Kansas City by Doctor Woods and had been advised by him to take the bankrupt act and had been assured by him that the bank had charged off his note, and he took it for granted the note was cancelled, with another note he owed the bank, but which has no concern with this suit. We may as well say at this point that plaintiff had been in the practice of the law, but had retired from practice to engage in the real estate business. He was an intimate and old-time friend and, as said, an office associate of Talbott, and aided him to get on his feet on his return to Kansas City. Their relations are indicated by the fact he presented to Talbott a note owing by him for several thousand dollars—that note, due Lipscomb, being part of Talbott's old Kansas City indebtedness. Together they laid out and promoted the town of Leeds as a speculative venture, they then and there owning in severalty adjoining tracts, and

Lipscomb knew generally of the fact that Talbott had made his conveyance of that land to White to secure his note to the bank.

On Talbott's said return the president of the bank resumed his friendly business relations with him, expressed the desire to aid him in getting on, used him in making some real estate deals and at no time prior to the alleged sale of the note to plaintiff made any claim on behalf of the bank on Talbott for the payment of the note. The testimony shows that up to the time of such sale Talbott thought the real estate was lost to him because the note had been "charged off." He had kept no track of the land, supposed it had been taken for the debt (on which he had otherwise paid nothing), that one hand had washed the other and the incident was closed. His conclusion in that regard was not the result of any actual knowledge or agreement on his part, but mere inference from the lapse of time, the silence of the bank since his return, the fact he had conveyed the land as security, and the letter of the president to him while in Colorado advising him to take the bankrupt act and assuring him that his note to the bank had been charged off.

With things in this fix on October 3, 1906, Talbott received through the mail, from the Barr and Widen Mercantile Agency, in St. Louis, a letter with a studiously ominous heading. That heading blazoned forth the following portentous facts; that the agency was "not incorporated," that it was: *"Publishers of delinquent debtors who can, but do not pay their just debts, and are consequently unworthy of trust or confidence. Reporters of how people pay their bills. Expert adjusters of debts, throughout the United States, Canada and Europe. Correspondents everywhere, the World our territory."* We shall take the liberty to recur to this heading further on. Following that heading was this letter:

Lipscomb v. Talbott.

St. Louis, Mo., U. S. A., Oct. 3, 1906.

Mr. L. J. TALBOTT,
    Kansas City, Mo.

Dear Sir:

    The National Bank of Commerce, of Kansas City, Mo., has placed in our hands for collection a claim against you amounting to $45,690 accompanied by special instructions not to use any aggressive measures in your case, for the bank states, that they consider you upright and honest, and that you no doubt, will settle this claim amicably, if you are in a position to do so.

    We certainly hope you will show your appreciation of the good opinion that your creditor still has of you by writing to us at once and frankly stating what you can, and will do, towards the settlement of this claim.

    Thanking you in advance for the attention you will give this

Respectfully yours,

BARR & WIDEN MERCANTILE AGENCY.

That was the first information Talbott had that the bank considered the note a debt yet due and unpaid. Talbott laid that letter aside unanswered, and on November 19, 1906, received another from the same source having the same heading, with this moralizing variation: "Always be honest and pay your debts promptly, and you will build a reputation far beyond the value of all money." That letter reads:

St. Louis, Mo., U. S. A., 11—19—06.

Mr. L. J. TALBOTT,
    Kansas City, Mo.

Claim of National Bank of Commerce, of Kansas City, Mo., for note, amount, $45,690.

Dear Sir:

    ' Your failure to reply to our recent courteous letter, regarding the above noted alleged claim, justifies the belief, that the debt is a just one, and that you evidently intend to evade the payment of same. We regret that you have taken this position, for in refusing to settle this matter amicably, you will force us to use severe and aggressive lawful methods to make this collection, methods which will prove to you by experience, that aside from a question of honesty, it costs far more to attempt to evade the payment of a just debt, if such is the intent, than it does to honestly pay it in the first place.

    This creditor trusted you because you were thought to be upright and honest, but by ignoring repeated demands for payment, failing to reply to letters, and allowing this debt to remain un-

paid you certainly justify the thought that, possibly, this confidence in you may have been misplaced.

If you justly owe this debt, it is certainly to your interest to settle same without further delay, or at least to promptly write us, frankly stating exactly what you can and will do towards a settlement, for if convinced that you intend to do what is right and fair, we will not proceed against you, otherwise drastic legal measures will be used to enforce our client's rights.

For your convenience we inclose herewith self-addressed envelope for your reply.                              Respectfully.

When Talbott got this last letter he concluded that the agency, in the peculiar business it was in, intended to make trouble for him, annoy him; accordingly he went over to the Bank of Commerce with the letters in hand, laid them down before Doctor Woods and asked him what they meant. That interview and its result follow:

"I says, 'From what you wrote to me I supposed you had cancelled those notes.' 'No,' he says; 'we didn't cancel the notes, we charged them off the books.' I think he said, 'But you have never paid them, have you?' I says, 'No, I have never paid them.' 'Well,' he says; 'these men came around here some time ago, and I gave your notes with some other notes, turned them over to them, that's their business to collect those kind of notes,' and I told him I supposed they were cancelled from the letter I had received from him. 'No,' he says, 'I just charged them off the books,' and he was dictating letters to his stenographer and turned around and went on dictating and I picked the letters up and walked out."

How many departments there were in the Barr and Widen Mercantile Agency is dark, but one department has a name harking back to losses by fire or by perils of the sea, viz., "*Salvage* Adjustment Department." One Salter was manager of that department, Mr. Talbott's note was put in his hands as such manager and he wrote the foregoing letters. The Bank of Commerce also had a department which took charge of "tough

debts or hard debts," to use the language of its president. At a certain time a representative of Barr and Widen called on the bank and wanted it to turn over to the agency "a lot of these claims for collection." Terms being agreed on and "signed up," Talbott's note with other claims were given over to that agency. It seems, however, that the note itself was retained by the bank after this "signing up" with the agency until the deal with Lipscomb was ripe for consummation as will presently appear.

Smarting under the fact, thus ascertained in that interview, that his note had been given over to an agency in a distant city—an agency of the character indicated by its letters—Talbott returned to his office and presently showed the letters to Lipscomb and told him the result of his interview with the bank president. This was the beginning of Lipscomb's knowledge of or connection with the affair. It seems that Talbott presently got the notion of having the note purchased by his own brother on his (Talbott's) behalf, if it could be legally done for a few hundred dollars and if his brother would let him have the money, and he sought advice from Lipscomb on that point. Lipscomb declined to give him advice as an attorney, because out of active practice, but told him he had better take legal advice. Thereupon Talbott went to Mr. Wash Adams of the Kansas City bar and laid the matter before him. He was advised by Mr. Adams that a purchase of the note in his own behalf directly or indirectly would not inure to his benefit or relieve him from liability. On that advice Talbott gave up the idea. It seems, however, Talbott presently told Lipscomb the result of this interview with Adams, and Lipscomb, having held the matter in solution in his mind for some little time, concluded to see what he could do on his own hook. His relations with Talbott were of such sort that he was constrained to ask him if he (Talbott) had any objections to his buying the

note. Adams's advice about a purchase directly or indirectly by Talbott was fresh in the minds of both, and, when Talbott informed Lipscomb he had no objections whatever, it was talked over between the two that Talbott was to have no interest in the purchase if one could be made. While Talbott was on the stand being cross-examined, he was closely pressed on this point, not only as to the language of the interview with Lipscomb but as to his own inward state of feeling, his thoughts, his hopes. Thus pressed he frankly admitted that he "thought" Lipscomb would give him something at the end. There was no agreement of that sort. Lipscomb did not *say* he would; *contra,* he said the contemplated purchase was to be on his individual account. Talbott did not *know* he would, and Talbott's thoughts, so far as the record shows, in that behalf were alone referable to those Pleasures of Hope which now and then spring unbidden, unarticulate and unexpressed in the bosom of man. Presently a correspondence sprang up between the Barr and Widen agency and Lipscomb that resulted in Lipscomb's getting the note for $200 cash in hand paid by him.

It is denied on one side and affirmed on the other that this transfer was a *sale* or that the agency had authority to sell. It is affirmed on the one side and denied on the other that Lipscomb was guilty of fraud and misrepresentation in the transaction which should defeat his right to the note and result in a rescission. A summary of the pertinent facts in that regard follow, viz.:

December 7, 1906, Lipscomb wrote Barr and Widen thus:

Dear Sirs:

You have two notes for collection against L. J. Talbott of this city; one of $11,621.75 face value, and the other for $45,690 face value, I suppose.

Mr. Talbott is now and has been for more than ten years absolutely without assets whatever. He is now and has been abso-

Lipscomb v. Talbott.

lutely execution proof for many years past. If I can buy those notes at a nominal figure I may do so. It will be impossible to force a payment of one cent from Mr. Talbott. If you question my statement as to Mr. Talbott's responsibility, you can verify the same by an investigation. Will you sell these notes to me? Let me hear from you by return mail.                    Yours truly.

To that the Barr and Widen people replied December 13, thus:

Dear Sir:

Replying to your favor of the 7th inst., *in re* to claim National Bank of Commerce v. L. J. Talbott, Kansas City, Mo., secured by notes aggregating $57,311.75, beg to advise that we are perfectly willing to dispose of this paper to you, provided the amount which you are willing to pay meets with the approval of our clients.

We, of course, cannot submit them any proposition until we know definitely what you are willing to pay.

Awaiting your reply submitting top price, we beg to remain,
                    Respectfully yours.

To theirs, on December 14, Lipscomb replied with this:

Dear Sirs:

I said to you in my letter in regard to the purchase of the L. J. Talbott's notes that I would pay a nominal sum; I also said to you that Mr. Talbott was execution proof and had been for years, and there is absolutely no prospect of anybody being able to force a collection of these notes. I am in a position to use them to my advantage in a small way, but I cannot put a price on your property.                    Yours truly.

Having made inquiry of their regular correspondent, Williamson, in Kansas City, Barr and Widen received the following:

Gentlemen:

Responding to your inquiry concerning L. H. Talbott, who was formerly connected with the Luce & Talbott Manufacturing Co., I beg to say that so far as I am able to learn, I think that nothing could be collected from Mr. Talbott by execution. He is in the real estate business, is married, and has no property.
                    Yours very truly,
                    JOHN I. WILLIAMSON.

On January 3, 1907, Lipscomb wrote Barr and Widen this:

Gentlemen:

As I said to you in the first place, I cannot afford to pay anything but a nominal price for the Talbott notes. .As things stand, and as they will always stand, not one cent can be made out of Mr. Talbott. This debt is only a very small part of the debts he owes. He has been advised, and Dr. W. S. Woods among the number of his advisors, to take the benefit of the Bankrupt Act, and this he will do as soon as he can arrange to pay the expenses. He has not one cent of assets, and I think his debts will reach $400,000 or $450,000; hence I cannot afford to pay you more than $200 for these National Bank of Commerce notes.

Yours truly.

On January 5th Barr and Widen wrote the bank to the effect they had an offer of $200, spot cash, for the Talbott notes from a party in Kansas City. Unfortunately this letter is not in the record.

On January 12, 1907, the bank wrote Barr and Widen as follows:

Gentlemen:

L. J. Talbott, $57,311.75. This is in answer to yours of January 5, to the effect that you can get $200 in cash for our claim; beg to say that you are authorized to close the deal on this basis, and we will surrender our notes.          Very truly yours,

W. S. Woods, President.

On January 14, 1907, Barr and Widen wrote Lipscomb this:

Dear Sir:

Owing to the holiday rush our reply to your letter of January 3d, in reference to National Bank of Commerce notes v. L. J. Talbott, has been delayed. We note your offer of $200 for these notes. However, even though debtor is as you say hopelessly insolvent, we believe that a fair settlement in this case would be 1 per cent, which would amount to $573—say $500. This settlement, we believe, which is less than 1 per cent, would be accepted by the bank on our recommendation. We urge, therefore, that you again take the matter under advisement and consider our proposition, as even $500 in settlement of a claim of $57,000 is certainly something awful, but we believe on the strength of our recommendation we can

persuade the bank to surrender the notes to you on payment of that sum.

Enclosing for your convenience an addressed stamped envelope, and trusting your reply will be a favorable one, we beg to remain.

Respectfully yours.

## On January 15, Lipscomb replied as follows:

Dear Sirs:

I cannot see my way clear to pay any more than $200. I do not know that I can make good on that sum. I know I cannot get any more, and no other man can get as much as I can.

Yours truly.

## On January 17, Barr and Widen replied as follows:

Dear Sir:

We have for acknowledgment your favor of the 15th inst., explaining that $200 is all that you can afford to pay for the L. J. Talbott notes, but we do not feel justified in submitting this unusually small offer to our clients, as when fees are deducted they would receive less than $200.

However, if you will make your offer $300, so as to net them a half of 1 per cent on their $57,000 claim, we will submit a settlement on that basis, although you must admit it is certainly slaughtering the claim, 99½ per cent is a most remarkable discount.

Trusting that you will reconsider the matter and confirm the above, we beg to remain.          Respectfully yours.

## On January 21, Lipscomb replied as follows:

Dear Sirs:

I rather think that I was unwise in suggesting that I might pay $200 for the Talbott notes. I have said to you that no money whatever can be forced from Mr. Talbott by legal process. It is not a question of discounting this debt 99½ per cent; it is just a question of you finding whatever I finally agree to pay.

Yours truly.

## On January 22, Barr and Widen replied as follows:

Dear Sir:

In response to yours of the 21st inst., *in re* to claim, National Bank of Commerce v. L. J. Talbott, would say that we have written

creditors to forward the original notes and have advised settlement on basis of $200.

Kindly advise us by return mail through which bank we shall make draft with notes attached.

.Thanking you in advance, we beg to remain.

Respectfully yours.

It seems that Barr and Widen on the same day wrote the bank, but that letter is not in the record, nor do we find its purport further than can be inferred from the following reply:

Gentlemen:

LEE J. TALBOTT. This is in answer to yours of Jan. 22. Beg to hand you herein the original notes as follows:

$45,690.00, due October 27, 1892.

2,557.81, being interest note on above.

11,621.75, due July 22, 1892, less credit $4,387.50.

Kindly close the matter up at your earliest convenience, and oblige.                                              Yours truly,

W. S. WOODS, President.

On January 28, Lipscomb wrote Barr and Widen as follows:

Gentlemen:

Of course I must inspect the notes before I buy them, and must know that they are genuine, and that they are all right. You can send them to the Fidelity Trust Company with instructions for them to permit me to inspect them and draw your draft on me for the $200, and if I find them all right I will pay the draft.

Yours truly.

On January 29, Barr and Widen, wrote the Fidelity Trust Company as follows:

Dear Sir:

We enclose herewith draft on J. H. Lipscomb in compliance with his written request, with the understanding that the notes and papers attached thereto are subject to his inspection, and are to be delivered to him on payment of $200.

Thanking you in advance for the attention you will accord the case, we beg to remain.                           Respectfully yours.

Mr. Lipscomb paid the draft mentioned in the last letter and the notes were turned over to him. (Note:

It will be observed there is another note included in the transfer which does not concern us.)

On February 9, 1907, Lipscomb wrote Barr and Widen as follows:

Gentlemen:

With reference to the notes recently purchased through you, I beg to say that I have no evidence of your authority to sell these notes. Of course I could go to the bank here and ascertain that you had authority, but I do not think it proper to question your authority, so write asking if you will not send me the letter of the bank written to you authorizing you to sell me this paper. I have not even evidence enough in my possession to prove up the claim in bankruptcy proceedings even if the makers of the notes interposed no objection, and then it may be some time before I can do anything with these notes and changes may occur which may make it exceedingly awkward for me to prove this claim in court.

Yours truly.

To the last letter they replied as follows:

Dear Sir:

Replying to yours of 9th inst., in reference to the L. J. Talbott notes, would say that as the letter to which you refer is addressed to us, we prefer to retain it here for our files.

If you doubt our authority we have no objection whatever to your calling up the bank and asking them for such evidence as you may require for your records. Mr. W. S. Woods, the president, will no doubt be glad to give you the necessary papers to enable you to prove your claim at such time as you wish.

Respectfully.

That correspondence is supplemented by oral testimony on behalf of plaintiff by several witnesses to the effect that later in 1907 they severally interviewed the officers of defendant bank. One or another of said witnesses informed the bank that Lipscomb had bought the notes and wanted to know if the bank had received the purchase money and whether Barr and Widen had authority to sell them. To them was exhibited a deposit slip showing the bank had received $150 from Barr and Widen as the net proceeds of the note transaction. They also saw at the bank some of the letters of Barr and Widen to the bank. Some of these wit-

nesses testified the president of the bank informed them, when told that Lipscomb had bought the notes, that that was all right, that Barr and Widen had the right to sell them to Lipscomb. *Contra,* the president testified that Barr and Widen had no authority to "sell," that they only had authority to "collect."

We gather from the testimony of the managers of the Barr and Widen agency that their letters employed *stock* expressions and ran in a rut in using the same words in any kind of a transaction; for instance in this case when they say the claim was "secured by notes" that was a stock expression meaning *evidenced* by notes; that, regardless of the kind of transaction, we infer they always used the words "settlements," "adjustments" and "surrender" in their letters. They further testified they did not look on the Lipscomb deal as a sale; that they knew nothing of any security behind the note. One of them hazarded the remark that in the lost letter to the bank of January 5, 1907, they likely used the words "full settlement." The original of that important letter was confessedly once in the possession of the bank and was seen by plaintiffs' witnesses there. Its absence is not accounted for, and Barr and Widen, singularly enough, kept no copy of it, though they produce other copies. The custom of Barr and Widen in closing transactions was never to "indorse" notes.

The allegations of the answer, relating to the "Statutes of Limitation, were not supported further than by proof of payment of taxes and the bank's claiming the land.

Such, substantially, are the facts. Any others necessary to a determination of the case will appear in the opinion.

There are two main questions, namely: (1) Was the thing done a sale and transfer, or a collection and surrender, of the note? (2) Was there fraud on the part of Lipscomb entitling the bank to rescind?

I.   There are minor contentions to be set at rest to clear the way for those main propositions. Let us attend to them.

(a)  *Of ratification.*   In law he who can authorize may ratify; ratification is tantamount to a prior authority or command and relates back to the start.   The rule seems to be in this jurisdiction (whatever it may be generally) that if a party relies on ratification he should tender such issue in his pleading.   [Wade v. Hardy, 75 Mo. 399; Noble v. Blount, 77 Mo. 242; Loving Co. v. Cattle Co., 176 Mo. 353-4; McClanahan v. Payne, 86 Mo. App. 292.]   In the case at bar ratification of the acts of the agents is relied on by appellant, but as there is no such issue in the pleadings, if we follow the above rule, the point must be ruled against him. The soundness of the rule is open to great doubt. Whatever exceptions might arise because of some peculiar phase of the pleadings, it would seem that evidence tending to show ratification ought to be admissible under the issue: Is there or is there not a contract? What difference in principle does it make whether the proof commences at one end or the other? In one event the authority is directly shown, in the other facts are shown which are tantamount to such authority.   In both the result is the same.   But we need not decide the point because in this case the facts relied on to show ratification, to-wit, admissions, remain operative as bearing on the question of sale or no sale.

(b)  *Of the Statute of Limitations.*   Defendant bank pleads the ten-year statute as a defense against the cause of action and to vest title to the real estate in it.   The same proposition is advanced in the brief of its learned counsel.   As to that we rule:

(1)  Assuming for the present the existence of a mortgage, we search in vain for evidence of *adverse* possession.

(2)  Assuming (still for the purposes of the point) that the conveyance to White, in form absolute, was in

substance and in equity a mortgage to secure a debt to the bank, and assuming that the bank took possession *under that conveyance* by agreement of parties, then it would hold possession presumably as mortgagee and not adversely, as that term is known to the law. For the purposes of the mortgage it is the general doctrine that the Statute of Limitations does not run while the mortgagee is in possession under the mortgage. [Hayes v. Schall, 229 Mo. 121 *et seq.* and cases cited.] The right to redeem and the right to foreclose being reciprocal it would seem the one would begin and end with the other.   [Stall v. Jones, 47 Neb. 714 *et seq.* and cases cited.]

(3) A trustee, a tenant in common or a mortgagee (while such relations exist) in possession does not hold adversely to the beneficiary, the co-tenant or the mortgagor. [Ricords v. Watkins, 56 Mo. 553; Butler v. Lawson, 72 Mo. 249; Coberly v. Coberly, 189 Mo. 16 *et seq.*]

A possession, begun friendly and in subordination to the true title or an agreed status, does not change into an adverse possession by a mere shift in mental attitude or by caprice.  The shifts and whims of the mind are allowed no such potency by courts.  Such possession may become hostile and finally put up the bar of the statute, but it must become hostile and continue hostile by acts of such unequivocal character and of such inherent nature, so open and so manifest, as to give notice of the change from a friendly to a hostile possession. [Coberly v. Coberly, supra.]  The facts in this case do not measure up to that stringent rule.  We hold against respondent on the question of limitation.

(c)   *Of the existence of a mortgage, and herein of certain incidents.*

(1)   In paragraph "b" the existence of a mortgage was assumed.  That assumption is sound under the facts in the statement of the case.  Here there was

a subsisting debt, a request for security, a compliance with that request in a conveyance to secure that debt—the proceeds of sales to be credited on that debt. Indeed, as we construe the answer of defendant bank it practically concedes the conveyance to White was a mortgage at the outset. Whether that be so or not, the testimony runs in a broad current that way. Under the combination of facts present in this case, equity, which deals with the kernel of things, will open the mere shell of the conveyance and see a mortgage as its soul and purpose. It follows that there sprang into being a right to foreclose and a right to redeem. The rights of redemption and foreclosure are inseparable from and inherent in a mortgage in spite of the intent of the parties. [Wilson v. Drumrite, 21 Mo. 325.] So, the maxim applies: Once a mortgage always a mortgage. As between the mortgagor and mortgagee the mortgagee's power to sell and apply the proceeds to the debt does not affect the character of the instrument.

(2)    Something is made of the fact that the value of the security was less than the debt. But that fact does not affect the character of the conveyance. Such disparity could have been a possible sentimental inducement for the bank to take title in payment of the debt. It might have said to Talbott: "You are a broken debtor. You consent to be stripped bare of all assets. You are irretrievably ruined. I will take your property for your debt and surrender your note." But it did not take that view of it or do anything of the sort. It held its debt and took its security. The ups and downs of real estate values in ambitious and growing western cities are not unnatural. The values of equities in such lands wax and wane so smartly that what to-day is an asset to-morrow because a liability, and what to-day is a liability to-morrow becomes an asset. Indeed great and unnatural depressions in values such as seemed to exist in Kansas City in 1900,

not unfrequently precede sharp rises in value. So, hills follow hollows, sunshine follow clouds, and the darkest hour comes before the dawn. Accordingly the bank took its chance on a rise, on its debt, on its security for its debt, and on a debtor behind the debt whose fortunes might mend. It put the matter to that touch and must win or lose on the event.

(3) There being a mortgage it became an incident to the debt and follows it like a shadow. They are inseparable. Like Ruth to Naomi (if one may borrow without irreverence in a law case from that tender pastoral) a mortgage says to the note it secures: Whither thou goest, I will go; and where thou lodgest, I will lodge. Says Lord MANSFIELD in Martin v. Weston (2 Burr. 1. c. 978-9): "A mortgage is a charge upon the land; and whatever would give the money, will carry the estate in the land *along with it,* to every purpose. The estate in the land is the same thing as the money due upon it. It will be liable to debts: it will *go to executors.* . . . The *assignment of the debt,* or *forgiving it,* will draw the land after it, as a consequence: nay, it would do it, though the debt were forgiven only by *parol*: for the right to the land would follow, notwithstanding the Statute of Frauds." (The italics are his Lordship's.)

"A mortgage of either real or personal estate is but an accessary or incident of the debt, or the security which is given as the evidence of the debt. The assignment of the security passes the interest in the mortgage. The mortgage cannot exist as an independent debt." [*Per* SOUTHLAND, J., in Landgon v. Buel, 9 Wend. 84.] Such is the general doctrine. [Bank v. Bank, 203 U. S. 306; Carpenter v. Longan, 83 U. S. 275.] And such is the rule in Missouri. [Hagerman v. Sutton, 91 Mo. 531; Borgess Inv. Co. v. Vette, 142 Mo. 574.] So, the title to the note may pass with delivery without a formal indorsement. [Davis v. Carson, 69 Mo. 609; Bocka v. Nuella, 28 Mo. 180; Johnson v. Johnson, 81

Mo. 331.] "The transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter. If not assignable at law, it is clearly so in equity. . . . The mortgage can have no separate existence. When the note is paid the mortgage expires. It can not survive for a moment the debt which the note represents. This dependent and incidental relation is the controlling consideration, and takes the case out of the rule applied to choses in action, where no such relation of dependence exists." [Per Mr. Justice SWAYNE in Carpenter v. Longan, supra.] The live maxim in a dead language, pertinent here, is: *Accessorium non ducit, sed sequitur suum principale*—which (I am told by scholars who claim to know) means: That which is accessary or incident does not lead, but follows, its principal.

(d) *Of a cancellation of the defeasance, or right to redemption.* Counsel for respondent argue that the defeasance (meaning thereby the right of redemption) was cancelled, whereby the land became the absolute property of the bank. There are cases where the debt has been cancelled and the full title to the land taken over by the mortgagee by subsequent agreement on an adequate consideration, or where estoppel has arisen precluding the right to redemption or foreclosure and making the conveyance absolute in fact. We are cited to cases of that kind—*ex. gr.*: Shubert v. Stanley, 52 Ind. 46; Trull v. Skinner, 17 Pick. 213; Haggerty v. Brower, 105 Ia. 395; Carpenter v. Carpenter, 70 Ill. 457, are samples. It is unnecessary to discuss those cases *seriatim;* for there were vital facts in them absent from the case at bar. The books show that equity watches such transactions with a jealous and rather apprehensive eye; and the most that can be said for the doctrine of the cases cited is that by subsequent agreement on adequate consideration, or by estoppel, the defeasance or right to redemption may be cancelled and the mortgage become an absolute conveyance. We

may (even at the expense of brevity) borrow with profit from an author, wielding a strong and discriminating pen, a guarded formulation of apposite law (1 Jones on Mort., 6 Ed., sec. 340) viz.:

"If originally taken as a mortgage, nothing but a subsequent agreement of the parties can change its character, and deprive the mortgagor of his right of redemption; and even such an agreement cannot change its character as to intervening interests. This right cannot be waived or abandoned by any stipulation of the parties made at the time, even if embodied in the mortgage. The maxim, 'Once a mortgage always a mortgage,' applies to such a deed; and if a purchaser takes a conveyance from the grantee, with a knowledge that the grantor claims an interest in the property, he takes it charged with the same equities with which it was charged in the hands of the mortgagee. But this maxim was never intended, and has never been construed, to prevent a mortgagee, by subsequent contract, from purchasing the equity of redemption, or from obtaining a release of it, for an adequate consideration. The mortgagor may make a subsequent release of the equity of redemption, but an adequate consideration is necessary to support it. It must be for a consideration that would be deemed reasonable if the transaction were between other parties. The transaction must in all respects be fair, with no unconscientious advantage taken by the mortgagee. Such a release will not be inferred from equivocal circumstances and loose expressions. It must appear by a writing importing in terms a transfer of the mortgagor's interest, or such facts must be shown as will estop him afterwards to assert any interest."

The facts of our case, as said, do not bring it within the exceptions to the maxim, Once a mortgage always a mortgage. We see no elements of estoppel. We can find no subsequent agreement on an adequate

243 Sup.—3

consideration whereby the right of redemption was cancelled. Whatever was done in the way of agreement was done at the outset, and if it was as respondent contends (which we do not find) it would have been void if it undertook to cancel the right of redemption in a mortgage executed contemporaneously.

To sum up so far: The Statute of Limitations has not run; the conveyance to White was a mortgage for the benefit of the bank; the mortgage followed the note as an incident to plaintiff, provided he bought the note; so, there was no cancellation of the right to redemption changing the character of the conveyance from a mortgage to an absolute deed in equity.

We have not discussed the conveyance from White to the bank; for there is no serious contention that the bank does not stand in White's shoes. It took with notice. It holds as he held, and not otherwise.

With these questions at rest we face the main proposition in the case.

II.  *Was there a sale of the note to Lipscomb?*

The facts have been heretofore set forth fully of set purpose, and they need not be repeated. We hold there was a sale. This because:

(1)  In the first place Lipscomb intended to buy, not pay. So much is beyond cavil or doubt. This fact would not control if it were shown that the bank did not in fact sell, but it is a fact to be reckoned with where there is somewhat of a *swearing bee* on "intentions" and the situation is obscure. A stranger to a note ordinarily does not pay the note. When he negotiates for it the presumption is he intends to buy. So, where the paying party is a stranger, as here, and intends to buy, as here, we start with the strong presumption that the thing done was in fact a purchase and not a payment. [Harbeck v. Vanderbilt, 20 N. Y. 395; Prather v. Hairgrove, 214 Mo. 156 *et seq.*] In the Prather

case there is an elaborate review of the authorities on
this head (*q. v.*).

(2)  In the second place, the possession of the
note by Lipscomb was sufficient to raise a presumption
of a proper transfer by some one possessed of title to
the note.  [Fitzgerald v. Barker, 85 Mo. 20-1.]

Useful presumptions arise from the usual course
of business dealings which are constantly acted upon
by courts.  We have been lately over this ground in
Hartwell et al. v. Parks, 240 Mo. 537, and the inquiring
mind is referred to that case for a discussion of the
philosophy of that doctrine in the light of our deci-
sions, and its proper application.

(3)  In the next place Barr and Widen either in-
tended to sell on the unequivocal offer of Lipscomb
to buy or they planned an out-and-out and coarse fraud
upon him.  They say now on the stand (testifying by
"hindsight" in the light of an after-glow) that they
did not intend to sell.  But if such was their intention
it was kept secret.  Their letters to Lipscomb spell
"s-e-l-l."  We take their letters for it.

(4)  Did Barr and Widen have authority to sell?
Whatever authority they had at the outset, we hold they
finally had authority to sell on this record.  The admis-
sions of the officers of the bank, made after the event
and testified to by credible witnesses, make out a case of
such authority.  If it be said those admissions are in-
ferentially or even directly contradicted, yet the cor-
respondence must be reckoned with on that score.  Lip-
scomb in plain terms made an offer to buy.  In such
event, if Barr and Widen had or thought they had no
authority to sell it was their duty either to refuse the
offer or to submit it to their principal, the bank, for de-
cision.  In the usual course of business that is pre-
cisely what an agent would do and is presumed to do.
[Breckinridge v. Ins. Co., 87 Mo. 71.]  Now, these
agents did submit the matter to their principal.  Un-
happily that letter (the one of January 5) comes up

missing and is made conspicuous by its absence—a
conceit traced by pundits to Tacitus, if memory does
not play me false.

Presumably that letter told the bank the fact.
What was the one conspicuous and pressing fact? It
was that a party made an offer to buy the Talbott notes
for $200. Those witnesses who saw this mislaid letter
put its contents that way in effect. To that letter the
bank replied: ''This is an answer to yours of January
5, to the effect that you can get $200 in cash for our
claim; beg to say that you are authorized to close the
deal on this basis, and we will surrender our notes.''
The word ''surrender'' in the connection used means
deliver over. (Note: At that time the bank had the
notes). The word ''deal'' referred to a pending offer
to buy the notes for $200. Pursuant to that authority
Lipscomb's proposition was accepted. He demanded
to see the notes before he bought them; they were
sent to him for inspection before purchase and turned
over to him on his payment of the offered price, which
payment passed into the money chest of the bank. Barr
and Widen say they knew nothing about any security
for the notes. That may well be. Doubtless one of two
things is true, either the bank forgot about the security
or labored under the impression it was exhausted—
that the land had been sold. But neither the forget-
fulness or inadvertence of the bank nor the lack of
knowledge of the agents would keep an incident to the
note, i. e., the mortgage, from passing to the purchaser.
The sale of the note tacitly drew the mortgage after
it for whatever it was worth, as a matter of law, as
heretofore seen. *Incidentia rei tacite sequuntur.*

Because the result may be unexpected or harsh,
and the case hard, shall we write bad doctrine that may
draw other cases within its hazard and mar the sym-
metry of the law? We are admonished that hard cases
are the quicksands of the law. Neither equity nor the
law relieves those who seek aid in court merely to avoid

the effects of their own negligence. What say the maxims: The law favoreth diligence, and therefore hateth folly and negligence. Negligence always has misfortune for a companion.

(5) It is argued that Lipscomb bought the note on joint account with Talbott. If Talbott had an interest in the purchase and if the note was bought on his account we would have another case to deal with. But as the facts show that Talbott has no interest in the purchase, paid nothing and owns no interest in the thing bought, we need not discuss that question. As shown in the statement, Talbott under pressure was made to say that he hoped or expected or thought Lipscomb would give him something if he got anything out of it. Instead of criticism the witness is to be commended—he was "swearing to his own hurt" as the Psalmist puts it. The testimony is without any efficacy in sustaining the defense. If the issue were guilty intent on Talbott's part, then his feelings, his thoughts, were a subject of inquiry, but where the question is whether he had an interest in the purchase, his hopes, expectations or other form of thoughts are worthless on the issue unless based on fact. Are Lipscomb's rights affected by Talbott's thoughts expressed long after the event? Suppose this court should say that in view of Talbott's ruined fortunes we also hoped or thought Lipscomb actually would give him something, would that hope give him an interest or be an unworthy one?

III. *Was Lipscomb guilty of fraud entitling the bank to rescind?* We hold he was not. Fraud in sales arises in so many ways that care is due not to mechanically apply the law of one case to another unless the facts are similar. Usually the vendee, not the vendor, sues to rescind for fraud, and counts on false representations relied on by him and made by the vendor about the quantity or quality of the thing sold

or the vendee is kept from making investigation by false statements. In such case the vendee has relief unless guilty of an act of folly in shutting his eyes when to open them is to see. In other cases there are dealings between those holding a fiduciary relation or where trust and confidence is reposed. Such dealings are narrowly watched for fraud on the part of the one (whether buyer or seller) in whom confidence is reposed. In other cases parties are unequally matched, the strong oppress the weak, children, married women, the old, the feeble are involved. But we have no such case at bar. In our case the owner of a note, a great bank, put it on the market and as vendor now sues the vendee to rescind on account of fraud. There was no fiduciary relation between them. The vendor reposed no trust or confidence in the vendee. They dealt strictly at arm's length, neither relied a whit on the other; neither asked of the other any information or facts operating as a moving cause in the transaction. Both knew how to take care of themselves and neither belonged to the class looked on as wards of chancery. It may be conceded Lipscomb believed, or suspected, there was some security back of the note he could reach, or that he had a chance to reach. That puts the case in the worst possible aspect for him. Did he owe a duty to make discovery to his vendor of his belief or suspicions in that regard? If so, why? And under what rule of the law of sales? We are not now dealing with the refined and speculative ethics of doctrinaires. We are dealing with practical rules for everyday transactions. The question is whether a vendee, such as Lipscomb is, at the hazard of having his purchase rescinded, must disclose to his vendor his views or suspicions or even knowledge of the existence of facts which may greatly enhance the value of the thing put by the vendor on the market? Must he make discovery of advantages he thinks or knows will accrue to him by the purchase? If Lipscomb owed that duty,

every one of us owes it in every case of barter and sale. I do not understand such to be a rule in equity in measuring the duty of a buyer to a seller.

In the leading case of Fox v. Mackreth, 2 Bro. Ch. R. *420, THURLOW, Lord Chancellor, said: "And without insisting upon technical morality, I don't agree with those who say that where an advantage has been taken in a contract, which a man of delicacy would not have taken, it must be set aside; suppose for instance, that A. knowing there to be a mine in the estate of B. of which he knew B. was ignorant, should enter into a contract to purchase the estate of B. for the price of the estate, without considering the mine, could the court set it aside? Why not, since B. was not apprised of the mine, and A was? Because A. as the buyer, was not obliged, from the nature of the contract, to make the discovery. It is therefore essentially necessary, in order to set aside the transaction, not only that a great advantage should be taken, *but it must arise from some obligation in the party to make the discovery.* The court will not correct a contract merely because a man of nice honor would not have entered into it; it must fall within some definition of fraud; *the rule must be drawn so as not to affect the general transactions of mankind.*" [The italics are ours.]

The doctrine of Fox v. Mackreth is adopted by a jurist whose fame is justly great (1 Story, Eq. Jur. [13 Ed.], sec. 205) and by cases collated by appellant's counsel. We think it sound and applicable here.

The case put by Lord Chancellor THURLOW of a mine of which the buyer knew and of which he knew the seller was ignorant, is stronger than the instant case. Here the buyer had every reason to suppose the seller knew all the facts, whatever they would turn out to be. It had taken the mortgage. It had dealt with the property with the power to make sales. It knew what it had done as donee of that power in executing it. It now chose to sell the note, apparently disgraced and worth-

less from old age and no credits. It was in a much better situation to know the true situation than the buyer, for he could only reason about or guess at it, and risk a venture thereon. If it be argued that the very fact of the bank's offer to sell the note, was notice to Lipscomb it did not know, or had forgotten, then the case resolves itself back to the one put by Lord THURLOW.

However, it is argued that Lipscomb made false representations in his letters by suggestion, intimation or by way of false reasons given for his offer of $200, and his desire to buy. If there was any testimony whatever that Lipscomb's intimations, representations or reasons were relied on by defendant bank whereby the price was beat down or the sale brought about, it would be worth while to consider that phase of the case, but we have no such case. Here the agents made their own investigations. So, there is no testimony defendant bank either saw, heard or cared for the reasons, intimations, and suggestions of Lipscomb. Why should it, when it knew more than he did? It is unthinkable that the bank would have been moved thereby if it had heard of them. The bank made up its own mind for its own reasons. What they were is entirely dark. It sent its old and unfortunate customer's note to an agency, not inappropriately called a "junk shop," thereby turning him and the note over to those who advertise torture to collect desperate claims. We use the term "torture" advisedly. Those who from choice make a livelihood of debt collecting only from the poor, the miserable, the broken, are likely to use torture in some form of pressure, and the more refined the sensibilities of their victims the greater the chance of success. The Barr and Widen people are of that kidney. Witness, the forbiding and ominous heading of their letters. It proposed to *sting* debtors by *posting* them.

"Well," says Goldsmith, "had the boding tremblers learn'd to trace the day's disasters in his morn-

Lipscomb v. Talbott.

ing face.'' What even school boys saw in the sour morning face of the schoolmaster in the Deserted Village, debtors read in the threatening heading of Barr and Widen's letters. ''The World our territory,'' read the headlines—so the ''world'' was Pistol's ''oyster'' which he would ''open'' with his sword. Viewed as tenderly as the record allows, the bank is no object of sympathy in a court of conscience in this unhandsome and unhappy transaction, however just its dealings otherwise. Nor can it complain of the price paid. It's method of dealing with the claim necessarily beat down the price by advertising its own contempt for its own paper. Let us put a case. Suppose Lipscomb had deceived himself into the belief there was security behind the note when there was none, and on that mistaken theory had offered and paid $10,000 for it, the bank not being a party to the deception, could he have rescinded? Or could he rescind and recover back his $200 on that theory? If so, what becomes of the doctrine of *caveat emptor?*

Something is said of mistake as ground of recovery. A mutual mistake of fact? No claim is made of that sort. What kind of mistake? If it made a mistake in supposing that the mortgage followed the note as an incident that was a mistake of law. If it made a mistake in supposing that the mortgaged property had been exhausted by sales, that was its own mistake, arising from its own negligence, with which its buyer had no part or parcel, and we are not cited to any case sustaining a right to rescind on that score. If it made a mistake in supposing the defeasance was cancelled, it is in the same plight. If it forgot, must its vendee remember for it and warrant it?

But we shall not pursue the matter further. Our conclusion is that the decree was for the wrong party. It is reversed and the cause remanded with directions to enter a decree as prayed by plaintiff. All concur.