BETTIE NEAL ET AL. v. OTT CALDWELL ET AL., Appellants.—34 S. W. (2d) 104.

Division Two, December 31, 1930.

1148

*Don C. Carter, Clark, Boggs & Peterson* and *Harry T. Limerick, Jr.,* for appellants.

1150

*Hulen & Walden* and *Ruby M. Hulen* for respondents.

1152

DAVIS, C.—This is an action to probate a will alleged to have been destroyed by the testator as the result of undue influence and an unsound mind. The jury returned a verdict in favor of plaintiffs (proponents) and established a certain paper writing, averred to be, in substance and effect, a copy of her will, as the last will and testament of Mary L. Robinson, deceased. The defendants, her heirs at law, appealed.

The evidence for plaintiffs warrants the finding that Mary L. Robinson, hereinafter called testatrix, in October, 1924, placed in the kitchen stove and destroyed by burning a will which she had executed in May, 1920, and which was subscribed by her and witnessed by G. L. Hulen and J. B. Owings in her presence and the presence of each other. She declared to them that it was her will. The will provides, summarized, that, after the payment of debts and expenses of last illness and funeral, her property shall be divided into fourteen equal shares and distributed one share each to the seven brothers and sisters of her deceased husband, or their heirs, and one share each to her seven brothers and sisters, or their heirs.

J. B. Robinson was the husband of Mary L. Robinson, testatrix. He died in 1914, leaving testatrix, his widow, and their son, Garland. Garland died in 1916 and left surviving him his wife and his mother, testatrix. Testatrix died August 28, 1926, leaving as her heirs at law the defendants herein. At the time of her death, testatrix possessed personalty valued at $30,000, and more than 420 acres of land in Boone County. Testatrix resided on a farm owned by her, with others who operated it as tenants. On February 22, 1921, Rob Riley, the husband of Minnie Riley, a defendant, became the tenant of testatrix under a contract. Rob and Minnie, niece of testatrix, moved to the home of testatrix, and occupied the homestead with testatrix under the rental contract providing for her board. Two men, one a brother of testatrix and the other a brother of Minnie Riley, also resided there. Testatrix until her death, resided with Rob and Minnie Riley; however, about September 1, 1925, Rob and Minnie Riley moved their resi-

dence to Sturgeon, taking testatrix with them. While living with the Rileys, both on the farm and at Sturgeon, testatrix occupied a room to herself. At her death testatrix was aged about eighty years. Until December 10, 1923, when she was stricken with pneumonia, she was a healthy, vigorous woman. She was very ill during the attack and never entirely recovered from its effects. She improved and went about during the summer and fall of 1924, accompanied by others, visiting neighbors, transacting some business and going to the town of Clark.

A Mrs. Robertson was her nurse from the inception of her illness until about March 1, 1924. Mrs. Oma Roberts succeeded her and remained until September 1, 1924. From then until November 10, 1924, testatrix was without a nurse, except that Minnie Riley and possibly others gave her attention as needed. Various nurses were in attendance thereafter until her death. For many years her hand had been crippled. Succeeding the pneumonia, she was in feeble health and suffered from an infected tooth and the effects of age.

Prior to 1920, testatrix transacted at least a portion of her banking business at the Bank of Clark, of which S. P. Hulen was the cashier. She advised with him and he attended to her banking business, made loans and collected interest. This relation continued until shortly prior to her illness. In May, 1920, on a visit to the Bank of Clark, she advised Mr. Hulen of her intention to execute a will and requested him to write it, which was accordingly done. Testatrix subscribed the will and two witnesses attested it as such in her presence and in the presence of each other, although Mr. Owings stated that he did not see testatrix subscribe it. S. P. Hulen testified that he wrote only one will for testatrix, and that G. L. Hulen and J. B. Owings witnessed it. G. L. Hulen testified that he witnessed but one will for testatrix. Rob Riley, husband of defendant Minnie Riley, with whom testatrix lived, testified that testatrix, in October, 1924, placed in a stove and burned a will signed by her and which was witnessed by George (G. L.) Hulen and Mr. (J. B.) Owings.

S. P. Hulen was the only witness testifying to the terms of testatrix's will. Testatrix brought a memorandum of names with her, and he used it in writing the will. After her death he wrote a copy of the will from memory, without the benefit of the memorandum, for he had not then found it. When his deposition was taken, he failed to disclose that he possessed such memorandum, although he produced it at the trial. One line of the memorandum was in the handwriting of testatrix. He did not keep a copy of the original will, but the copy prepared by him after her death was substantially the same as the original. It may be that the given names of the beneficiaries were substituted for initials or vice-versa, but the disposition of the property was precisely the same in the copy as in the original. It may be that some difference in phraseology obtains, but substantially none.

He stated that he failed to recall the names of the distributees without investigation, but that it was not impossible for him to remember that the will of testatrix distributed her property equally among her seven brothers and sisters, or their heirs, and among her husband's seven brothers and sisters, or their heirs. The only question was to discover who they were and their number to write an exact copy. It was admitted by the parties that the petition correctly set forth the heirs of testatrix and her husband.

The evidence shows that testatrix stated that Mr. Robinson's heirs ought to have a portion of her property, for he had accumulated it. She maintained an affection for her husband's brothers and sisters, and frequently remarked that she intended to make provision for them equally with her own relatives.

Her will, upon its execution, remained in a tin box of the testatrix in the vaults of the Bank of Clark, but the box and the will were removed to her home shortly before or shortly after she became ill.

On December 10, 1923, testatrix was stricken with pneumonia and remained dangerously ill until March, 1924, when the disease was broken. Nephritis then appeared and continued for six weeks. The diseases left her in a weak and feeble condition during the remainder of her life. She also developed a heart lesion, which finally caused her death.

I. Defendants first contend that plaintiffs' evidence was not clear and convincing (a) that the alleged copy of testatrix's will was a true copy, and (b) that the will destroyed by the testatrix in October, 1924, was the will drafted by S. P. Hulen and executed by testatrix in May, 1920.

The facts, that testatrix executed a will in May, 1920, drafted by S. P. Hulen and witnessed by George L. Hulen and J. B. Owings; and that testatrix was of sound mind at the time she executed the will; and that she destroyed a will in October, 1924, by placing it in the kitchen stove and burning it, do not appear to be controverted. The rules of law applicable to defendants' contentions are, first, that secondary evidence of the contents of a lost or destroyed will is admissible (Charles v. Charles (Mo. Sup.), 281 S. W. 417; 28 R. C. L. 382, par. 386; 40 Cyc. 1297); second, that one witness is sufficient to establish the contents of a lost or destroyed will (Graham v. O'Fallon, 4 Mo. 601; Dickey v. Malechi, 6 Mo. 177; Charles v. Charles (Mo. Sup.), 281 S. W. 417).

(a) We think that the evidence contains proof of reasonable certainty that the paper writing probated by the verdict of the jury was

a substantial copy of the will drafted by S. P. Hulen and executed by testatrix in May, 1920. Notwithstanding that S. P. Hulen was the only witness to testify as to the contents of the original will as executed by testatrix, yet his testimony met the rule, for it was clear and convincing. Hulen stated that the paper writing probated as a copy of the original will of testatrix disposed of her property as exactly as the original will; that the given names or initials of the beneficiaries may have been interchanged, but they were substantially the same. He testified that the will disposed of her property in this manner: "After her debts had been provided for, the provisions were that her estate should be divided into fourteen equal parts, and distributed equally to her seven brothers and sisters, or their heirs—those that were dead—and to his seven brothers and sisters, or to their heirs, if dead." Defendants say that the proof is not clear and convincing, because S. P. Hulen, in drafting the paper writing probated as a copy of the original will, was aided by some of the plaintiffs in calling to memory the beneficiaries. The crux of the situation was that testatrix divided her estate into fourteen equal parts, and left a part to each of her seven brothers and sisters, or their heirs, if dead, and to each of her deceased husband's brothers and sisters, or their heirs, if dead. It was then possible to obtain the names of the brothers and sisters of testatrix and her husband, and Hulen in so ascertaining them was merely refreshing his memory. But even if his memory had not been refreshed, the names of the brothers and sisters (or their heirs, if dead) were capable of extraneous proof and ascertainment, and this was shown by the admission of defendants that the parties, plaintiffs and defendants, and their relationship to Mary L. Robinson is as set out in the petition, and the petition avers that plaintiffs and defendants are the brothers and sisters of testatrix and her deceased husband, or if dead, his or her heirs.

It is said that the memorandum produced at the trial by S. P. Hulen, which testatrix handed him prior to the drafting of the original will and which he states he used, contradicts the paper writing probated, because it contains the names of six Rawlings children, who were not mentioned in the paper writing probated. The memorandum merely contains a number of names, which includes the names of the brothers and sisters of Mr. Robinson, and the brothers and sisters of Mrs. Robinson, and in addition the names of the six Rawlings children, characterized by a line reading, "Mildred Robinson Rollings children," evidently intended for the name Rawlings. The memorandum was shown to comprise two sheets of paper. Subsequent to the names of the brothers and sisters of Mr. Robinson and subsequent to the names of her brothers and sisters, the name of Mary L. Robinson appears on each sheet of paper. We see nothing in the memorandum to contradict the positive statement of S. P. Hulen that in the

original will the beneficiaries were the fourteen brothers and sisters (or their heirs) of Mr. and Mrs. Robinson. The paper writing shows that one share was left to the heirs of testatrix's deceased sister-in-law, Mildred Rawlings, and S. P. Hulen said that the paper writing disposed of her property exactly as the original will. This was substantive evidence of reasonable certainty. [Charles v. Charles (Mo. Sup.), 281 S. W. 417.]

(b) The evidence also shows with reasonable certainty, we think, that testatrix in October, 1924, destroyed the will drafted by S. P. Hulen in May, 1920, by placing it in the kitchen stove and burning it in the presence of Rob and Minnie Riley, her brother and testatrix's brother. S. P. Hulen testified that he never wrote more than one will for testatrix. George L. Hulen said that he never witnessed more than one will for testatrix. Rob Riley, husband of defendant Minnie Riley, testified that the will that testatrix placed in the stove and burned in October, 1924, was dated in May, 1920, and was witnessed by George L. Hulen and J. B. Owings and signed by testatrix.

Minnie Riley, defendants' witness, testified that the will burned by testatrix comprised two sheets of paper. S. P. Hulen, plaintiffs' witness, testified that the will executed by testatrix was written on a single sheet. From this contradiction, defendants deduce that the evidence fails to show that the paper writing probated was a copy of the will burned and destroyed. The determination of the truth of conflicting evidence is always the function of the jury. We think there is no doubt but that the evidence tends to show that the paper writing probated is a substantial copy of the will burned, thus rendering defendants' position untenable.

II. Before proceeding to a discussion of the issues of unsound mind and undue influence submitted to the jury, we deem it advisable to state that, as defendants submitted evidence subsequent to the overruling of their demurrers to the evidence, the whole evidence, both plaintiffs' and defendants', and all reasonable inferences therefrom, must be viewed in the light most favorable to plaintiffs. That is to say, plaintiffs' evidence and defendants' evidence, substantially aiding plaintiffs, if any, must be taken as true, and such of defendants' evidence as is unfavorable to plaintiffs must be taken as untrue. [Clark v. Atchison & Eastern Bridge Co., 24 S. W. (2d) 143, l. c. 151.]

III. Defendants aver that the evidence failed to justify the submission of the issue of unsound mind and the lack of testatrix's mental capacity, in October, 1924, to revoke her will. This contention calls for a summary of the proof in that regard.

At the time she destroyed the will, testatrix was seventy-eight years of age. On December 10, 1923, testatrix was stricken with pneumonia. Prior thereto she was an active woman for her age. She was very intelligent, possessed a good memory and a cheerful disposition and was a ready conversationalist. It may be said that she was a strong character, beloved by her friends and neighbors. While the pneumonia continued, her life was despaired of. Nephritis and heart disease followed the pneumonia. With the pneumonia broken about March 1, 1924, still she lingered in bed for some months from the ravages of the diseases. During the summer of 1924 she was up and about, and on a few occasions visited neighbors, accompanied by attendants. The effects of the pneumonia left her at times at least in a daze or stupor, like a person awakened from sleep, and her mind, according to a witness, in September, 1924, was in a very weakened condition. On cross-examination, this witness, in answer to a question what, besides weakness, very poor health and difficulty to make one understand her, indicated that her mind was not sound, that she did not understand what she was doing, replied, "Her eye looked like some one who was dazed. It was like one about half asleep or numb."

Witness Keyton, plaintiff, testified that testatrix was in a daze or stupor, and it appeared that her mind went with her strength. Shortly subsequent to the pneumonia, she indicated that she was not able to remember, nor would she converse, although prior to her illness she had been a good talker. When witness related unusual neighborhood occurrences to her, presently she would relate the occurrence, remarking, "Somebody told me this, but I don't just remember who told me." Based on his observation of testatrix during the summer of 1924, he deponed that she was not of sound mind. On cross-examination, he said that testatrix was not crazy; that she did not see or hear spirits—she was like a child and you could persuade her into almost anything.

Mrs. Fannie White, plaintiffs' witness, testified that she resided in the neighborhood and visited testatrix prior and subsequent to her illness. In 1924 she visited her as often as once a month. She testified: "She looked like she was in a kind of a stupor most of the time. She was kind of sleepy and it did not seem like she cared much for anything. That is the way it seemed to me. I don't know what you would call it.

"Q. What was your opinion as to whether her mind was sound in 1924, or not? A. Well, it wasn't as it used to be. I reckon you would not call it sound, but she was not crazy. But her mind was weakened with her body, I think, just as everybody else's does."

Asked as to indications of a weakening mind and illustrations as to forgetfulness, witness said: "Well, she wanted to introduce me to the nurse—that if she had been in her right mind she would know

that I had known her for years." Her testimony shows that this occurrence took place in 1925.

Mrs. Gulick, plaintiffs' witness, was asked as to the soundness of testatrix's mind in 1924. She replied, in substance, that her mind was never sound after her illness like it was before. Prior thereto she was a very intelligent woman and a fine conversationalist. After her illness, she never carried on a conversation and did not seem interested, although, during a visit, she would ask about some of the family and would again ask about them before witness left.

Witness Evans, for plaintiffs, testified that before her illness she was bright and alert and always talking. In the summer of 1924, he saw her in bed and her tongue was kind of paralyzed. Her mind was not like it used to be when she was up and around. "Q. You would not say that she was of unsound mind? A. Oh, I am no judge."

Mrs. Georgia Keyton, plaintiffs' witness, asked as to the soundness of her mind in 1924, testified that she never seemed like Aunt Puss (testatrix) after she became sick. She never talked the same and was without that bright sparkle in her eye. It seemed like her mind went as her body went.

Mrs. Nettie Morgan, plaintiffs' witness, the daughter-in-law of testatrix and the widow of testatrix's deceased son Garland, testified that in 1920 or 1921 testatrix said to her, "I have my tombstone and everything fixed so Robbie's people can get just as much as my people." In March or April, 1925, witness spent a week at the home of testatrix. She said that testatrix did not seem to know her on her arrival, so she remarked, "Mrs. Robinson, this is Nettie come to see you." Her eyes were dazed, and she said, "Mrs. Robinson, this is Nettie come to see you;" then she shook and squeezed her hand, but did not say very much. Witness stood there, thinking she would talk to her, but testatrix, during witness's visit, never carried on a conversation. She did not seem to notice or recognize anything going on around her. She seemed to be dazed and you could see from her eyes it was a mental case. She said testatrix was not of sound mind. She said it seemed that testatrix knew her, but she never said "Nettie," and from the dazed look on her face she could not be sure.

Mrs. Oma Roberts, defendants' witness, testatrix's nurse, on question of sound mind, testified that her mind was sound, a good mind, but that like her body it was weak at times, as she had been very sick and was old. She was not crazy, and her mind at times would be all right, although at times she seemed forgetful and weak, and when fever was up, she was irrational and flighty. Mrs. Roberts left her position as nurse for testatrix about September 1, 1924, but thereafter visited her on occasions. She said she saw very little change in her condition.

The record shows that lay witnesses testified directly that testatrix was of unsound mind. However, defendants say, first, that the rule

obtains (Messick v. Warren (Mo. Sup.), 217 S. W. 94) that the opinions of lay witnesses that testatrix was of unsound mind, unsupported by facts upon which the opinions are based, have no probative value whatever in determining her mental capacity; second, that the objection made to the question propounded to S. P. Hulen, plaintiffs' initial witness, regarding her mental condition and objected to on the ground that no facts were detailed upon which to base an opinion, which was overruled and an exception saved, was a seasonable objection and that it was not necessary, in order to save the point, to continue to repeat the objection to the same testimony. Defendants cite to support their position Schierbaum v. Schemme, 157 Mo. 1, 57 S. W. 526; Ex parte Dick & Bros. Quincy Brewery Co. v. Ellison, 287 Mo. 139, 229 S. W. 1059; Wabash Railroad Co. v. Cockrell, 192 S. W. 443.

We think it expedient to first discuss the second contention. The objection, as to testatrix's mental condition, was that Hulen had detailed no facts upon which to base an opinion. Hulen testified, without objection, that, when he visited her in 1925, testatrix had nothing to say, didn't seem like herself, was frail and weak. The court then overruled an objection to a question as to her normal condition, and Hulen said that he did not consider her normal, either mentally or physically, but he could not say whether or not she was of sound mind. Defendants made no objection to the testimony of other witnesses that they were of the opinion that testatrix was of unsound mind. The supporting facts and circumstances upon which they based their opinions were not analogous to the supporting facts detailed by Hulen, for the supporting facts related by the other witnesses were of greater probative value. It thus appears that the situations were not similar. The record does not show that defendants made seasonable objections to the testimony of any witness, except Hulen, as to the question of testatrix's unsound mind.

Inasmuch as we have concluded that defendants failed to object to the questions as to testatrix's mental condition, slight evidence only of supporting facts and circumstances is required, although it must be substantial. If defendants had objected, further supporting facts may have been elicited from the witnesses. In this regard the evidence shows that the witnesses had known testatrix intimately for years. In her active years, they had known her as a bright, intelligent and forceful woman, but, subsequent to the pneumonia, they observed a marked change in her mental condition, and on visits found her in a daze or stupor and with memory impaired. That she was childish, with a weakened mind, due to the ravage of diseases, is amply supported by the evidence. In this condition she disavowed, by burning her will, a purpose that her mind and heart in strength and health dictated as her desire and duty.

However, defendants say that the record is without evidence that she was of unsound mind on the day in October, 1924, that she burned

the will. It is true that the evidence does not directly show her mental unsoundness on that day. Mrs. Oma Roberts, defendants' witness and testatrix's nurse from March 1 to September 1, 1924, testified that after she left, she visited and nursed testatrix several times, and that there was not much change in her condition. The evidence tends to show that in the summer of 1924 and in September of that year, testatrix was of unsound mind. It further tends to show that there was not much change in her condition, and that in March or April, 1925, she was of unsound mind. It is to be presumed that she did not recover her mental faculties during the interval, when the burning of the will occurred, thus rendering it at least a jury question. [Byrne v. Fulkerson, 162 S. W. 171.] The facts and circumstances were of sufficient probative value to submit the issue of testatrix's mental unsoundness to the jury. [Knapp v. St. Louis Trust Co., 199 Mo. 640, 98 S. W. 70.]

IV. On the ground that the record is without evidence of undue influence, defendants complain of the submission of that issue to the jury. A summary of the pertinent evidence is necessary. The evidence develops that testatrix, at the time of the burning of her will, was seventy-eight years of age, that she was ill and childish, and that her mind was not only greatly weakened from the ravage of diseases, but that she was of unsound mind. On a certain day in October, 1924, so defendants' evidence shows, testatrix entered the kitchen in the presence of Rob and Minnie Riley, Ott Caldwell, Minnie's brother, and J. H. Caldwell, testatrix's brother, and, without uttering a word, first handed her will to Rob Riley and in turn to the others, and, after they read or glanced at it, she lifted the stove lid with one hand and with the other put the will in the fire. Shortly thereafter, in talking to Mrs. Jones, her nurse, she said she wanted to make a will and asked Mrs. Jones if she thought she was capable, and Mrs. Jones advised her that she did not know. In the same conversation she told Mrs. Jones that Mr. Robinson had accumulated the property and that she felt that his folks ought to have a part of it, and she wanted to leave them a part of it. Mrs. Jones further said: ''Whatever Mrs. Riley said was done. If she said not to go, of course we didn't go; or, she didn't.''

It may be inferred that in October, 1924, Mrs. Riley was in charge as nurse. Mrs. Caldwell, defendants' witness and a wife of defendant, testified that she heard Mrs. Riley say that all the Robinsons wanted was her money. ''Q. She would tell Aunt Puss that all the Robinsons wanted was her money? A. Yes, she might have.'' Mrs. Caldwell also testified that she asked Mrs. Riley, in testatrix's presence, if testatrix did not have a will; ''What became of it? She did have?'' and Mrs. Riley shook her head, and witness went back and never said another word, it was none of her business. She testified Mrs. Riley since then

said that she was afraid she could not have treated Aunt Puss right had she read her will. Other witnesses testified that Mrs. Riley told testatrix that the Robinsons were not kin to her; they were kin to her husband. A nurse testified that Mrs. Riley requested her never to leave testatrix alone with the Robinsons and to report anything said by them.

Undue influence is rarely established by direct proof. It may be proved by facts from which it may be inferred. The age and the mental and physical condition of the testatrix are relevant facts. Undue influence must be such as to control the mental operations of the testatrix, and it may consist of importunities such as the testatrix has not the courage to resist and are yielded to for the sake of peace and quiet. [28 R. C. L. 41.] It is not enough that the opportunity to exercise it existed, but it must appear that the influence was actually exercised to an extent that the will of the testatrix was controlled against her will.

The evidence tends to show that the age of testatrix, her childishness and illness, and the weakened condition of her mind and body, left her with a weakened and impaired will power. Witnesses told of Mrs. Riley saying to testatrix that the Robinsons were not kin to her, but kin to her husband. The testimony of Mrs. Caldwell was tantamount to saying that she would say to testatrix that all the Robinsons wanted was her money. In her weakened and helpless condition and with an impaired will power, these statements amounted to importunities. That they occurred more than once is shown by the evidence. What the testatrix desired in her condition was peace and quiet, the stoppage of the insistence that the Robinsons were not her kin and that all they wanted was her money. Mrs. Riley knew that she had executed a will, and it may be readily inferred that she knew that the Robinsons were substantially mentioned therein. What then could she have meant by her importunities than that she desired testatrix to destroy her will? Why importune or worry her with statements that the Robinsons were not kin to her and all they wanted was her money, if it was not with the purpose of coercing her to destroy her will? The fact that, after the destruction of the will, she inquired of Mrs. Jones as to her ability to make a will, stating that Mr. Robinson had accumulated the property and that she felt his folks ought to have a part of it and she wanted to leave them part of it, in connection with the importunities of Mrs. Riley, was some evidence of an undue influence exerted by Mrs. Riley. In her weakened and helpless condition, it may be inferred that testatrix did not have the courage to resist the importunities as related. [Gay v. Gillilan, 92 Mo. 250, 5 S. W. 7, 1 Am. St. 712.] The fact that testatrix destroyed her will while weak in mind and body, thus renouncing a purpose adhered to in health and strength, in connection with the facts and circumstances herein, has some probative force. [In re Young's Estate, 33 Utah,

382, 94 Pac. 731, 126 Am. St. 843, 14 Ann. Cas. 596, 17 L. R. A. (N. S.) 108, on principle is pertinent.] In 28 Ruling Case Law, page 139, paragraph 92, it is said: "Obviously, it requires much less influence to control the will of a person of weak mind and infirm purpose than one of vigorous intellect and determined character." We think the issue of undue influence was properly submitted to the jury.

V. An assignment of error reads: "The statements of Mary L. Robinson that she had made a will, or intended to make a will, dividing her property between her relatives and her deceased husband's relatives, were inadmissible as proof of undue influence or of mental incapacity."
Defendants did not admit the verity of the contents of the burned will. Even though S. P. Hulen drafted a copy of the original will from memory after testatrix's death, yet he testified as to the contents, and that was an issue determinative by the jury. The statements of testatrix, as to her will and the disposition of her property, made or intended to be made, were admissible in corroboration of the contents of the will. It was said on this question in Charles v. Charles, 281 S. W. 417, l. c. 419, quoting from Mann v. Balfour, 187 Mo. 290, l. c. 305, 86 S. W. 103 (citing cases), that, "Where substantial evidence has been adduced to show the due execution of the will, that it has been lost, that it was not revoked, and its contents, it is then admissible to prove in corroboration of the other evidence what the testator himself said about it." If the evidence is competent for any purpose, it cannot be excluded, although its effect may be limited by instruction. [Thompson v. City of Lamar, 17 S. W. (2d) 960, l. c. 975.]

VI. The defendants complain that the court erred in permitting improper cross-examination of defendants' witness Minnie Riley, as to how she and her husband had prospered and paid for her farm and home while living with testatrix. Over the objection and exception of defendants, witness was required to answer the question: "While you were living there with Aunt Puss, you and your husband made considerable money, didn't you?" and she answered, "We made it and spent it." She was also required to answer questions and stated that their farm was not paid for when they went to live with testatrix, but that, at the time of the trial, it was paid for. She was further required to testify and she stated the amount that she and her husband paid for a home in Sturgeon and the amount of the mortgage on it.
The assignment of error shows the defendants complain of plaintiffs' cross-examination of their witness. One issue before the jury was undue influence, and it may be inferred from the evidence that the witness examined had used such influence. The questions put

were collateral and apparently irrelevant to the issues tried, but they may have thrown some light upon them. We cannot think that the jury, in reaching their verdict, were influenced by the preceding examination, for it was not shown that the money received by either Minnie Riley or her husband was illegitimately obtained from testatrix. We think rather that they gave heed to the instructions and the evidence bearing on unsound mind and undue influence. Trial courts have more or less discretion relative to the cross-examination of witnesses. We adhere to the ruling in Adriance v. Arnot, 31 Mo. 471, l. c. 472, reading: "There must be a certain discretion left to the court in trying causes, to determine how far they will permit examinations of witnesses to proceed upon collateral matters not directly connected with the issues. We do not see that justice would be promoted by the interference of this court in a matter of discretion, because of a difference of opinion with the court below as to the point at which an examination should stop." [See also State v. Nasello, 30 S. W. (2d) 132, l. c. 139-140.]

VII. Defendants criticise plaintiffs' Instruction 1. This instruction involved testatrix's mental condition. The first objection to it is that it did not take into consideration that the destruction of the will might have been later ratified. While the record may show slight evidence of ratification, nevertheless we do not think that defendants tried the case on that theory, and, consequently, the trial court should not be convicted of error. Each and every one of defendants' instructions on the subject are predicated on testatrix's mental condition on the day she burned the will, for example, "and that she had a sound and disposing mind and memory at the time she destroyed said original will, then the jury must find for the defendants." Nothing was said in defendants' instructions concerning ratification. While it is the general rule that plaintiff's instruction directing a verdict must cover the defendant's defenses, yet where there is nothing in the record to show that defendants relied upon such an issue, the rule is not applicable. The evidence of ratification, if any, came in incidentally on cross-examination of defendants' witness. Mrs. Jones' evidence tended to deny ratification. In any event, defendants' instructions show that the issue of ratification was not tendered. While it seems to be general weight of authority that pleading of ratification is unnecessary (Lipscomb v. Talbott, 243 Mo. 1, 147 S. W. 798), yet the record shows that defendants did not assume to try the case on the theory that testatrix ratified the destruction of her will.

The instruction commences by requiring a finding that testatrix executed a will, while of sound mind, and that it was duly witnessed by Hulen and Owings, as well as that if her will was burned while she was not of sound mind, then it would remain her will. The in-

struction ends: "It is claimed, by plaintiffs, that the paper produced in the evidence, marked Plaintiffs' Exhibit A, is a substantial copy of the will of deceased Mary L. Robinson, so above mentioned, signed and witnessed, and afterwards alleged to have been burned by her."

Defendants contend that that part of the instruction quoted is a comment on the evidence and is misleading and prejudicial. It merely informs the jury of the claim of plaintiffs. It neither requires them to find any fact, nor assumes any fact. Mrs. Riley testified that the original will was executed by testatrix, and that fact does not appear controverted, for the answer admits that testatrix destroyed her only true will by burning it. It is no more of a comment than the commencement of defendants' Instruction 1, reading: "The court instructs the jury that the issue in this case is this: Is the writing introduced in evidence the last will and testament of Mary L. Robinson, deceased, or not?" We are unable to see that the jury were misled or prejudiced.

VIII. Instruction 3 is challenged by defendants. The contention that the record is without evidence to support the issue of undue influence has been ruled against defendants. The instruction does not assume that Mrs. Riley exercised power and influence over the mind of testatrix, but requires a finding to that effect. We have just held that the record does not justify the submission of the issue of the ratification by testatrix of the destruction of her will. We think the instruction does require the finding, in effect, that the will burned or destroyed by testatrix was the original instrument, signed by her and witnessed by George L. Hulen and J. B. Owings. We think the jury fully understood by the instruction that they were required to find that the will burned was the original will signed by testatrix and witnessed by Hulen and Owings. It was neither misleading nor prejudicial.

IX. Instruction 4 is said to constitute error. We do not think it assumed that Mrs. Riley exercised persuasion over testatrix. The other objections are disposed of by our rulings relative to Instruction 3.

X. Plaintiffs' Instruction 5, copied from Schaff v. Peters, 111 Mo. App. 447, l. c. 454, 90 S. W. 1037, reads:

"The court instructs the jury that undue influence alone is sufficient, if proven to your satisfaction, to impeach or set aside a will

under it, or to revive a destroyed will under it; and if you believe from the evidence that the paper destroyed was the last will and testament of the said Mary L. Robinson, and would not have been destroyed by burning it, if you so find, on the —— day of October, 1924, but for the undue influence exercised over the mind and will of the said Mary L. Robinson by Minnie Riley, then you should find that the destruction of said will was produced from the said Mary L. Robinson by undue influence, and that said destruction and burning was not the act and deed of the said Mary L. Robinson.''

Defendants first contend that the instruction assumes that Mrs. Riley exercised an undue influence over testatrix. We think it so assumed, but the question obtains, did it constitute prejudicial error? It is to be noted that the instruction does not direct a verdict. However, standing by itself it would constitute prejudicial error in view of the assumption. But instructions 3 and 4, for plaintiff, which preceded Instruction 5, and direct a verdict, expressly require the jury to find that Mrs. Riley exercised an undue influence over the mind of testatrix as to destroy her will and to coerce her to burn her will. Instruction 6, following, also requires the jury to find that Mrs. Riley exercised an undue influence over testatrix. This instruction merely assumed a fact which prior and subsequent instructions required the jury to find before they were authorized to return a verdict for plaintiffs. The jury certainly understood that they must find that Mrs. Riley's undue influence was operative before they were authorized to find for plaintiff. [Scharff v. Standard Tank Car Co., 214 Mo. App. 658, 264 S. W. 56; Koonse v. Mo. Pac. Railroad Co., 18 S. W. (2d) 467, l. c. 473.]

It is said that the jury were not advised that they could not find undue influence without finding some weakened condition of the mind or body which would afford substitution of another's will for that of testatrix, and, consequently, that it is in conflict with plaintiffs' Instruction 3 in that regard. Instructions must be read as a whole, and together these two instructions advised the jury correctly in that regard.

It is further said that plaintiffs' Instruction 5 is in conflict with defendants' instructions 1, 2 and 7, which directed a verdict for defendants if the jury found that testatrix was of sound mind at the time the will was destroyed. If there was any error as asserted, it was inherent in defendants' three instructions, because undue influence was an issue and defendants' instructions directed a verdict for defendants, if they found that testatrix was of sound mind, without taking into consideration the issue of undue influence. Defendants may not complain of vice in their own instructions, even if they conflict with a non-prejudicial instruction offered by plaintiffs.

XI. Plaintiffs' Instruction 6 is challenged on the ground that *it* pointed out to the jury and emphasized the evidence by which plaintiffs sought to prove that the will was destroyed by undue influence exerted by Mrs. Riley. It says, in effect, that if the jury believe that any influence was exercised by Mrs. Riley upon testatrix which so embarrassed and controlled the operation of her mind that she was not the mistress of her own opinions and wishes in respect to the destruction of her will, if you so find, this was undue influence within the meaning of the law. We do not think the instruction unduly emphasized or was a comment on the evidence.

XII. Plaintiffs' Instruction 7 tells the jury that undue influence may be proved by circumstances, and in determining whether Mrs. Riley exercised any undue influence over the mind of testatrix to induce her to destroy the will, they could take into consideration all the facts and circumstances. We see no error in this instruction. However, the objections urged to Instruction 6 are also urged as to this instruction, and they are untenable.

XIII. The court of its own motion, of which defendants complain, gave an instruction, reading in part:

"The jury are instructed that the issues submitted to you for your determination in this case are as follows:

"(1) Was the paper writing alleged to have been signed by the deceased Mary L. Robinson, as testatrix, and by G. L. Hulen and J. B. Owings as witnesses, and as testified to by witnesses S. P. Hulen, J. B. Owings and G. L. Hulen, the last will and testament of the said Mary L. Robinson, deceased?

"(2) If so, was the paper writing and purported will destroyed by the said Mary L. Robinson in October, 1924, as testified to by the several witnesses, the said original will executed by the said Mary L. Robinson and signed by G. L. Hulen and J. B. Owings, as witnesses?

"(3). Was or was not the said Mary L. Robinson, at the time she destroyed said will, in October, 1924, of sound and disposing mind and memory?

"(4) Or, if of sound and disposing mind and memory, do you further find that the destruction of said will by said Mary L. Robinson was the result of undue influence exerted upon and over her as explained in other instructions given herewith?

"(5) Is the paper writing offered in evidence and read in your hearing, and marked and designated as Plaintiffs' Exhibit A, a substantial copy of the will executed by the said Mary L. Robinson and

witnessed by G. L. Hulen and J. B. Owings, and afterwards destroyed by the said Mary L. Robinson in October, 1924?''

The instruction tells the jury nothing more than the issues involved. It does not require the jury to answer a question or to find a fact. Other instructions, however, required a finding of the identical issues that the instruction asserts are involved, and they were relevant issues. The instruction as formulated was of no material value to the jury, and we think could have had no effect upon their verdict. It was neither beneficial to plaintiffs nor detrimental to defendants. It merely asked questions with respect to facts that the jury by other instructions were required to find.

Defendants, among other objections, maintain that the instruction was a comment on the evidence in that it referred to the testimony of S. P. Hulen. It is evident that it was not a comment on the evidence, for it does not summarize any evidence. The purpose was the identification of a certain instrument.

After propounding the questions as above related, the succeeding line of the instruction reads: ''If you find the issues in favor of plaintiffs, your verdict should be in the following form.'' The defendants object on the ground that the jury were told that they could find for plaintiffs upon the finding of any of the above issues. We think the jury fully understood from the instructions given, requiring a finding of facts, the issues necessary to a verdict for plaintiffs, and that the absence of proof or satisfying evidence of such facts required them to find a verdict for defendants.

Other objections to this so-called instruction have previously been disposed of in our consideration of other instructions.

XIV. The court, of its own motion, gave to the jury a second instruction. By it the jury were, in substance, instructed that if the paper writing offered in evidence was not a substantial copy of the will of testatrix burned in October, 1924, or if said paper writing makes any other or different distribution of her property than the will witnessed by Hulen and Owings, or if it names a different executor than the original will, then the purported copy is not a substantial copy of the original will, and the verdict of the jury should be for defendants and they should find that the paper writing offered in evidence is not the last will and testament of Mary L. Robinson.

Defendants object to this instruction because it contains no requirement that the jury find that the will destroyed by burning was the will written at Clark, Missouri (or drafted by S. P. Hulen), or that the copy offered in evidence was a substantial copy of it. We have heretofore disposed of these objections in discussing other instructions. However, as the evidence shows that the will written at Clark,

Missouri, was drafted by S. P. Hulen and witnessed by G. L. Hulen and J. B. Owings, the instruction meets the objection, thus rendering the complaint untenable.

The judgment is affirmed. *Cooley, C.,* concurs; *Westhues, C.,* not sitting.

ON MOTION FOR REHEARING.

DAVIS, C.—In their motion for a rehearing, defendants aver that all the testimony submitted for the purpose of establishing undue influence related to facts and incidents subsequent to the destruction of the will; and that the record is devoid of facts and statements, prior to the destruction of the will, from which undue influence may be inferred.

Defendants assert that the testimony of Mrs. Lizzie Caldwell shows with certainty that any statement attributed to Mrs. Riley occurred subsequent to the destruction of the will. It is based on the testimony reading:

"Q. Did you wait on her any? A. When Mrs. Jones had to go away on business, I would stay in her place." (Mrs. Jones was testatrix's nurse.)

"Q. Was that in 1924? A. I first went there in November, 1924, the first of November, and I was there in '25, a time or two."

We think it is clear that the witness was speaking of the time when she first waited on testatrix in the role of relief nurse.

On cross-examination Mrs. Caldwell testified:

"Q. You were there in the summer of 1924, part of the time? A. Sure.

"Q. Minnie Riley was waiting on Aunt Puss and taking care of the house? A. She was doing the house work.

"Q. What did you hear Minnie Riley say about the Robinson heirs while you were there? A. I don't know that I heard her say anything in particular about them.

"Q. What did you hear her say about what the Robinson heirs wanted over there? A. Well, I could not just say. Maybe I didn't try to keep that in my mind—it was none of my business.

"Q. Didn't you hear her say that all the Robinson heirs wanted was her money? A. I might have said something to that effect.

"Q. Well, she said that? A. Yes, she did.

"Q. How many times did she say that? A. I didn't keep count.

"Q. Was it so many times that you could not keep count? A. Well, I don't know.

"Q. Quite a few times? A. She would get her temper up, sometimes.

"Q. She would tell Aunt Puss that all the Robinsons wanted was her money? A. Yes, she might have."

The testimony immediately preceding tends to show in our opinion that, during the summer of 1924, Mrs. Minnie Riley, by importunities to the effect that all the Robinson heirs wanted was her money, influenced testatrix to destroy her will. It was at least a question for the jury. These importunities occurred prior to the destruction of the will, or, more accurately speaking, it was evidence that they so occurred, thus authorizing the jury to find the fact. The preceding testimony of Mrs. Caldwell was sufficient to act as the basis of a finding that the importunities of Mrs. Riley unduly operated on testatrix to such an extent that, taking into consideration her condition and position, their effect was to destroy her will power and to cause her to burn her will. The testimony of Mrs. Caldwell, as to importunities prior to the destruction of the will, is sufficient to connect the testimony of other witnesses as to subsequent statements of Mrs. Riley and testatrix with it, so as to render the similar statements made by Mrs. Riley subsequent to the destruction of the will, as well as subsequent statements of testatrix, probative evidence of undue influence.

The motion for a rehearing is overruled. *Cooley, C.,* concurs; *Westhues, C.,* not sitting.

PER CURIAM:—The foregoing opinion by Davis, C., is adopted as the opinion of the court. All of the judges concur.