**Floyd HANNAH and Roy Hannah, Appellants,**

**v.**

**Ethel HANNAH, pro se and as Executrix under the Will of the Estate of Frank Hannah, Deceased, Lucille Akers, Russell Hannah, Wilbur Hannah, and Wayman Hannah, Respondents.**

**No. 55116.**

Supreme Court of Missouri, Division No. 2.

Jan. 11, 1971.

Louis Kranitz, Theodore M. Kranitz, St. Joseph, for appellants.

Bernard W. Gorman, Tarkio, for respondents.

PRITCHARD, Commissioner.

Frank Hannah's last will and testament was contested by two of his sons (Floyd and Roy Hannah who were excluded as legatees) in the trial court. The jury's verdict was that "the document dated August 10, 1954 is not the last will and testament of Frank Hannah." The proponents of the will filed alternatively their motion for judgment in accordance with their motion for directed verdict made at the close

of the whole case, or for new trial. The trial court granted the proponents of the will a new trial upon the stated ground that there was not sufficient evidence to submit the issue of undue influence of defendants (proponents) upon Frank Hannah in the making of his will (as submitted in Instruction No. 3, subparagraph second, which instruction was given by the court upon its own initiative).

■ The appellants here, contestants of the will, say that the trial court had no authority to grant a new trial on the ground that proponents did not set forth in their motion for new trial any attack upon Instruction No. 3 (or any attack upon several instructions submitting the issue of undue influence). They say (in the reply brief) that the court could not consider any matter not raised in the motion for new trial beyond the thirty-day period during which the court retained control over the judgment under Civil Rule 75.01, V.A.M.R. Be that as it may, the respondents have timely raised the issue in the trial court and here of whether under the evidence appellants have made a submissible case even though they were successful in procuring a new trial by reason of ruled error in Instruction No. 3. In Hart v. Midkiff, Mo., 321 S.W. 2d 500, 505 [4–6], citing Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73, 77 [11], it was held that a respondent who sought and obtained a new trial could have a review of the submissibility of the case, because that issue is basic. See also Osborn v. McBride, Mo., 400 S.W.2d 185, 188 [1] and cases cited. On the facts set out below it must be ruled that the contestants did not make a submissible case on any theory, and any contentions that the giving of Instruction No. 3 was error, or that the giving thereof was not preserved for review, are immaterial.

In his will, Frank Hannah (who died at the age of eighty-six) named Ethel Showalter (whom he married the next day after making the will) as his executrix and gave to her all his personal property, and "whatever remains undisposed of by her during her lifetime, I request shall be distributed in equal parts to my children, Lucile Akers, Russell Hannah, Wilbur Hannah and Wayman Hannah." Ethel was given a lifetime interest in a five-acre tract and another eighty-acre tract of land; with remainder to his said four children. Wilbur was given 145 acres of land; Wayman was given 148 acres of land; Russell was given 145 acres of land; and Lucille was given 145 acres of land, all absolutely. By Article VIII of his will it was provided, "To my sons Floyd Hannah and Roy Hannah I make no provision therefor in my will."

Contestants' evidence, stated in the most favorable aspect, is this: Floyd Hannah is the eldest son of the deceased, being born in 1914. He was married in 1935 up to which time he lived at home. Prior to his mother's death in 1951 she had been ill for four or five years, having had three strokes in succession. Three or four years before her death, the deceased (Frank) became cranky with her and got worse as time went on. Frank remained a widower until August 11, 1954, when at the age of sixty-nine he married Ethel. Prior to that time Frank complained of not feeling well, and he quit smoking saying he did not know whether or not that was his problem. Frank, along with Floyd, went to some kind of healer in Wymore, Nebraska, about 100 miles south of Atchison County, Missouri. After seeing the healer Frank brought back a pillow and said, "this doctor blessed it and for him to sleep on it and it would make him feel better." Frank told Floyd that he went back to the healer several times after his mother died in 1951. Floyd asked him why he did not go to an M.D., and he answered that he thought that kind (a healer) helped him.

Floyd had never had any serious disagreement with Frank, and had not the slightest idea of why his father cut him and his brother (Roy, also known as Bob) out of his will. Frank had never told him he had made a will. The will was read at the

Farmers and Valley Bank where an officer, Harold Boatman, got it out of a box.

From the time Floyd's mother died up to the time Frank married Ethel, Frank's appearance changed: "Well, he just—you couldn't talk to him and find out things from him. He had just changed that way. He acted like, I don't know whether he didn't feel good. * * * Well, he complained of his stomach hurting and he always had a lot of patent medicine. He took stuff he ordered out of magazines." Frank's temperament changed after 1951 and he was an impulsive individual. As to making decisions, "Well, a lot of times he would make up his mind to do something and somebody come along and talked to him and he would change his decisions." Frank was different with Wilbur, "For instance, you might ask him something and he would say, 'I will see what Wilbur thinks about it.'"

Over objection made only to the form of the question, Floyd was permitted to testify that he did not think his father was a man of sound mind at the time he had his will prepared on August 10, 1954.

After Frank's funeral, and after they read the will, Floyd had a conversation with Ethel at her home in which she said she did not understand, that Frank had promised her everything for her lifetime; that she had willed Frank everything she had for his lifetime; and he was going to will her everything he had for her lifetime but he did not do it. Floyd asked attorney Walter Mulvania as to why he and Roy were willed out, and Mr. Mulvania told him he did not know any reason—"He couldn't even remember making the will."

On cross-examination, it was developed that Frank and Floyd had been farming partners, Floyd taking one-fourth of the profits, prior to which Frank had given Floyd a team of horses and a team of mules. By 1940 Floyd had accumulated enough to buy a farm and go on his own, and saw Frank once a week or once a month at times. After Floyd's mother died,

Frank became rather quiet and did not have much to say. "He was a changed man." He was of unsound mind; he never was a drinker; he never asked Floyd's advice between 1951 and 1954. Floyd thought that Mrs. Hannah (Ethel) influenced his father to make the will he made.

Roy Hannah, the second from the youngest brother, lived at home until he reached maturity, then married and left home in March, 1946. Thereafter he helped his father operate his farmland, then 1,500 or 1,600 acres in all, plowing, sowing and combining. He learned that Frank remarried (to which he had no objection and which he considered desirable) the day after August 11, 1954. Roy's wife (Marcine) told him about Frank having pestered her (i. e., making advances toward her), and Roy looked in a window of his home one morning after Frank drove in and saw him running Marcine around the table, this being in 1951 about two months after Roy's mother died. He spoke to Frank about it (but did not tell him what he had seen) and Frank said that it was none of his business. Just prior to his mother's death, Roy and his wife and Frank and his wife went on vacation together. One morning when his mother was not feeling well and was crying, Frank slapped and kicked her—he was in a hurry to get on the road. Before that Frank had always been kind to her. Frank then did not act the same as he had in the previous two or three years—his temper increased and the condition of his health deteriorated as time went on until 1954—"He just didn't act the same." In different things he was asked, "He just wouldn't tell you." He would clam up.

Roy drove Frank twice to Wymore, Nebraska, to a faith healer. Frank told him that the doctor treated him by placing his hands on a pillow and telling him it would cure him. As to whether Frank's mind was rational, Roy first said that it was; then on further interrogation by his counsel said that he was not rational. Frank would take advice from Roy's sister and Wilbur "all the time," and Roy would call

Frank a person of weak decisions. From 1951 Frank just kept getting worse all the time and did not treat Roy as he used to. It was his opinion that Wilbur and Lucille were influencing Frank from time to time, "Why any time he wanted to go buy something, he always went to Wilbur and Wilbur did the buying, and I know he stopped in to my sister's. She told me herself. * * * He stopped in there one time and said he was going to have the will changed, that Barney Gorman made it and Floyd and I found out what was in it, and he was going to have another will made."

Marcine Hannah, the wife of Roy for twenty-four years, went with Frank to see the faith healer. Frank wanted to be younger and "this doctor told him he could make him younger." After the death of Marcine's mother-in-law, Frank came to her house and would say things out of the way; he grabbed her several times and bruised her arms; and he wanted them to move into his house and "he would see I was well taken care of if I would do the things he wanted me to do." "Q. What did he want you to do? A. Sexual, he wanted me that way. Q. Wanted you to have sexual intercourse with him? A. Right." He came down every morning, threatened her, and had "this wild look in his eyes." Frank told her that if she would run away and leave her husband and marry him he would deed her all of the land north of their house. He came to her house just after Mrs. Hannah was buried, "He was glad the funeral was over." Frank told her if she did not do as he said he would cut Bob (Roy) out of the will. She did not succumb to his intimidations which continued from 1951 until he married Ethel in 1954. Until 1960, Marcine attended reunions of the family, but then quit because of "jealousy and greed" of the sisters-in-law.

Over objection as to the form of the question, Marcine was permitted to testify that she thought Frank was of unsound mind from 1949 up to 1954. She "would describe him as a man of irrational think-ing, of looking perhaps silent at times, and at times he would be on the other hand lashing out at someone, and he degraded all of his children to me. He said he had no children." This was when he was making propositions to her (she then being twenty-one years of age and Frank was sixty-seven). Marcine knew of nothing that Roy and Floyd did toward Frank which would cause him to take them out of his will, "not unless he wasn't rational."

Attorney Walter L. Mulvania testified for proponents. He was a witness on Frank's will along with Anne Gebhards, now Anne Meade, who was his secretary. Mr. Mulvania remembered discussing with Frank the disposition of the property and the heirs and beneficiaries. Frank told him exactly what he wanted each child to have by way of land. He recalled that Frank told him that Floyd and Roy were interfering in his prospective marriage, and that he did not want them to share in the real estate or in the estate for that reason. He could not recall whether Mrs. Hannah (Ethel) was present. He gave his opinion based on his observations that Frank was of sound mind.

Anne Gebhards Meade also testified that she was a witness to Frank's will. She signed the document in the presence of Mr. Mulvania and Frank, and did so at the latter's request who declared it to be his last will and testament. She noticed nothing that she could recall that was odd or peculiar about Frank at the time. On cross-examination she testified that she had no reason to make up her mind whether Frank was a man of sound mind, that she did sign the will saying that he was of sound mind, which he appeared to be.

In considering whether the court should have granted proponents' after-trial motion for judgment in accordance with their motion for directed verdict made at the close of the whole case, it is necessary only to examine the evidence in connection with contestants' theory of their case as submitted in their requested and given instruc-

tions. Instruction No. 7 submitted as the ground for finding against the will the undue influence exercised over him by either one or more of the defendants. Instruction No. 8 defined undue influence, and also "that said instrument does not express the will, wish, or desire of said testator in the disposition of his property, then and in that event your verdict should be for the plaintiffs." Instruction No. 9 disjunctively submitted for a finding against the will that Frank was "not of sound and disposing mind and memory"; that he did not understand the nature and extent of his property; that he did not understand the ordinary affairs of life; that he was not able intelligently to weigh and appreciate his natural obligations to those persons who were the natural objects of his bounty; (again) that he signed the document by reason of the undue influence of one or more of the defendants; and, lastly, the will was signed by reason of a "strong aversion, dislike, anger, ill will or hatred toward Floyd Hannah and Roy Hannah," which controlled his will and judgment "in matters concerning one or both of his said sons." Instruction No. 3 (given by the court on its own motion) submitted Frank's unsoundness of mind and (again) the undue influence of defendants or any of them.

There was no objection to the testimony of contestants Floyd and Roy Hannah and witness Marcine Hannah that testator was of unsound mind at the time he made his will on the precise ground that such testimony was inadmissible in evidence because it was conclusionary without sufficient foundation being laid therefor. "As a general rule testimony consisting of mere conclusions of the witness must be considered and given its due probative value, when admitted without objection * * *." 88 C.J.S. Trial § 155, p. 302. Thus it appears here that the conclusions are in evidence in the case. But the consideration of such evidence does not there cease. The further inquiry is whether the conclusions of the witness and any facts stated in support of the conclusions are substantial evidence from which the jury could form its own conclusion as the trier of the fact. In Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 143 (where the issue was that of a submissible case based on opinions based on facts not inconsistent with sanity), it was said, "We think that the opinions of these lay witnesses, not being based on facts inconsistent with sanity, were wholly valueless. (Citing cases.) Such statements of opinions do not compel a submission of the issue of testamentary capacity to the jury." It was in that case also said, loc. cit. 152 S.W.2d 141 [1–8], " 'Substantial evidence is evidence from which the triers of the fact reasonably could find the issue in harmony therewith.' " In Neal v. Caldwell, 326 Mo. 1146, 34 S.W.2d 104, 110, the conclusions of the lay witnesses that testatrix was of unsound mind when she destroyed her will were not objected to. However, each witness described the mental condition of testatrix both before and after an illness. It was said that only slight evidence of supporting facts and circumstances was needed (to support the conclusion) *"although it must be substantial."* (Italics added.) In Wright v. Stevens, Mo., 246 S.W.2d 817, as the opinion shows, there was no objection to the conclusion of the witness (on that basis) that she thought testator was of unsound mind. It was said, loc. cit. 246 S.W.2d 822 [7], that "evidence of sickness, old age, peculiarities, eccentricities in dress or oddities of habit, forgetfulness, inability to recognize friends, feebleness resulting from illness, and other facts or circumstances not inconsistent with the ability to understand the ordinary affairs of life, comprehend the nature and extent of one's property and the natural objects of his bounty, and which are not inconsistent with sanity, cannot be used as a basis for the opinion testimony of a lay witness that a person is of unsound mind or insane." It was held that the statement of the witness that testator was of unsound mind had no probative force and the trial court properly directed a verdict upon the issue of mental capacity. See also 32 C.J.S. Evidence § 568

(5), p. 587; Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5, 10 [7]. Here there is not the slightest evidence, inconsistent with sanity, from these lay witnesses to support their conclusions that Frank Hannah had not the mental capacity to make a will. All there is here is that Frank became cranky with and abusive to his deceased wife; he complained of not feeling well and took patent medicines; he went to a faith healer; he was impulsive and changed his decisions, and he consulted Wilbur about decisions; he became quiet after his wife's death in 1951; and he made untoward advances to his daughter-in-law. In the words above set forth of the Wright case, none of these described characteristics are inconsistent with sanity. There is no evidence that he did not know the natural objects of his bounty (his second wife, Ethel, and all his children were named in his will); or that he did not know the extent of his property (his tracts of land are described and specifically devised); or that he lacked understanding of the ordinary affairs of life. Sturm v. Routh, Mo., 373 S.W.2d 922.

■ As to undue influence, there is not the slightest evidence that any person exercised any control over Frank in the making and execution of his will. The mere taking of advice from Wilbur does not amount to undue influence. Nor does the fact that Frank and Ethel had an agreement to leave their respective properties to each other for their lifetime show that she exercised any influence over him. Although Floyd testified that he thought Ethel influenced Frank to make the will he made, again there is not one iota of evidence supportive of such a conclusion. The undisputed fact that Ethel took much less under the will than she could have by renouncing it as widow is rather dispositive of the issue of her influence upon Frank in making the will he did. There is no showing of any confidential relationship between Frank and any of his children; no evidence that anyone other than Frank procured the attorney who drew the will. There is no evidence that anyone other than Frank was active in causing the will to be executed.

No evidence is present as would cause anyone to conclude that Frank was forced, coerced or overpersuaded by any of the defendants so as to destroy his free agency and will power. Switzer v. Switzer, Mo., 373 S.W.2d 930.

■ Contestants' last disjunctive submission in Instruction No. 9 relates to his aversion and ill will toward Floyd and Roy in matters concerning them as his sons. Although the fact that there exists an unequal or unnatural disposition of property in a will may be considered in will contests, the case of Wade v. Kirksville College of Osteopathy and Surgery, Mo., 270 S.W. 2d 811, 814 [2] and cases cited dispose of this contention. It is there said, " 'Evidence of unnatural provisions of a will is not sufficient in itself to establish either undue influence or mental incapacity. The law recognizes that a person of requisite age, free from undue influence and of sound mind, may if he so desires, execute an unnatural will, disinherit his own kin, and bequeath his property to an entire stranger; * * *.' " Here there is no substantial evidence of any mental incapacity of Frank Hannah, or of undue influence upon him, and the fact that he excluded two of his sons for whatever reason is an insufficient basis in itself to justify a finding against his will.

No submissible case on any basis was made by contestants. It is not suggested that on new trial the evidence would be any different or that there would be any additional evidence supportive of any theory. The judgment is reversed and the case is remanded with directions to enter judgment for defendants, proponents of the last will and testament of Frank Hannah, deceased.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.